**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:                                                    Chapter 11

FONTAINEBLEAU LAS VEGAS, LLC,

      Debtor.                    Case No.  09-21481-BKC-AJC

_____/

FONTAINEBLEAU LAS VEGAS LLC, individually
and as successor by merger to FONTAINEBLEAU
LAS VEGAS II, LLC,

Plaintiff,
v.

BANK OF AMERICA, N.A.; MERRILL LYNCH          Adv. Pro. No:  09-01621-AJC
CAPITAL CORPORATION; JPMORGAN CHASE
BANK, N.A.; BARCLAYS BANK PLC;
DEUTSCHE BANK TRUST COMPANY
AMERICAS; THE ROYAL BANK OF
SCOTLAND PLC; SUMITOMO MITSUI
BANKING CORPORATION NEW YORK; BANK
OF SCOTLAND; HSH NORDBANK AG, NEW
YORK BRANCH; MB FINANCIAL BANK, N.A.,

Defendants.
_____/

**AMENDED COMPLAINT FOR DECLARATORY JUDGMENT;**
**SPECIFIC PERFORMANCE AND/OR DAMAGES**

  Plaintiff Fontainebleau Las Vegas, LLC ("Plaintiff" or "Fontainebleau"), as and for its

complaint against defendants Bank of America N.A., Merrill Lynch Capital Corporation,

JPMorgan Chase Bank, N.A., Barclays Bank PLC, Deutsche Bank Trust Company Americas, The Royal Bank of Scotland PLC, Sumitomo Mitsui Banking Corporation New York, Bank of Scotland, HSH Nordbank AG, New York Branch, and MB Financial Bank, N.A. (collectively the "Banks" or the "Revolver Banks"), alleges, upon knowledge as to itself and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.      This case arises from the breach by a group of unscrupulous banks of their clear and unequivocal written promise to Fontainebleau to finance the construction of its multi-billion-dollar casino-resort development project in Las Vegas (the "Project") -- a promise in exchange for which the Banks have already secured for themselves tens of millions of dollars in fees.  As a result of that breach -- and absent an order of specific performance by this Court of the Banks' obligations -- the Project, which was nearing completion, is doomed to failure, and thousands of Las Vegas residents will lose their jobs.

2.      The governing loan agreements provide for $1.85 billion of bank financing for the Project under two term loan facilities and a revolving loan facility.  The banks obligated to provide the term loan financing have substantially complied with their obligations to date, by providing over $1,000,000,000 in funding.  However, the Revolver Banks, which are obligated to provide $770,000,000 in revolver financing (the "Revolving Loan") have unjustifiably failed and refused to do so.

3.      On April 20, 2009, the Revolver Banks notified Fontainebleau by letter that they would not honor their commitments under the loan agreement.  Instead, they purported to "terminate[]" those commitments, ostensibly based on "one or more" unspecified "Events of Default."

2

4.      In fact, there has been no Event of Default, and there is no contractual basis whatsoever for the Revolver Banks' breach of their clear and unambiguous obligations.  The purported termination is nothing more than the Banks' baseless attempt to walk away from the Project and abandon their obligations.

5.      The Banks' brazen breach of contract threatens to cause imminent and irreparable harm to Fontainebleau, including forcing Fontainebleau to stop construction of the Project, which will disrupt Fontainebleau's existing business and contractual relationships and damage the Fontainebleau brand.

6.      The Banks' breach will also cause enormous harm to the public interest.  In addition to the approximately 3,300 construction workers on-site daily (plus the additional 1,700 workers who would be needed to work on the final stages of the Project) and hundreds of others presently employed by the Project, the opening of the Fontainebleau Las Vegas is expected to result in over 6,000 full-time jobs at the facility, and approximately 2,000 additional jobs elsewhere in Las Vegas.  All of these sources of employment will vanish as a result of the Banks' breach -- a further blow to a local economy that, in the words of the <u>Las Vegas Sun</u>, is in "freefall" and may be in for its "longest recession since the Great Depression."

7.      The Revolver Banks' wrongful breach of their obligation to loan Fontainebleau $770 million is all the more egregious in light of the tens of *billions* of dollars that certain of the Revolver Banks have received from the federal government's Troubled Asset Repurchase Program ("TARP").  Defendant Bank of America, N.A., has to date received a total of $52.5 billion dollars in federal assistance (including funds received in connection with its acquisition of Merrill Lynch & Co., Inc., the corporate parent of defendant Merrill Lynch Capital Corporation) and JPMorgan Chase has received $25 billion dollars in federal assistance.  These TARP and

3

other funds were provided to the Banks with one purpose: to ensure that these Banks would begin lending again, and would continue to lend, rather than further constricting the flow of credit that is absolutely critical for any economic recovery. But instead of lending -- instead of standing by the contractual commitments to which they already agreed and are legally bound -- the defendant Banks have seized upon a false pretext -- a nonexistent unspecified "Event of Default" -- in a vain attempt to escape their obligations.

8.      The Revolver Banks' misconduct here was calculated, intentional and malicious. Defendants abandoned their lending commitments solely to try to extricate themselves from a loan they no longer wish to make, notwithstanding that those commitments are clear, unequivocal, and binding, and that Plaintiff and thousands of employees and their families are relying on those commitments to be performed.

9.      Accordingly, Fontainebleau by this action seeks specific performance of the Revolver Banks' obligations, as well as declaratory relief establishing that the April 20 purported termination of their commitments was improper and that the Revolver Banks are obligated to meet their funding commitments. In addition, although damages alone cannot compensate for the loss of irreplaceable financing for its unique resort, Fontainebleau seeks recovery from the Revolver Banks of all damages resulting from the Banks' bad faith breach of their obligations, including consequential damages arising from the Revolver Banks' bad faith and wrongful conduct, totaling in the billions of dollars. Finally, because the funds that are due and owing to Fontainebleau under the Credit Agreement are property of the bankruptcy estate, Fontainebleau seeks an order directing that those funds be turned over pursuant to 11 U.S.C. § 542.

10.      Fontainebleau also asserts two additional claims against defendant Deutsche Bank Trust Company Americas ("Deutsche Bank"). Deutsche Bank is a subsidiary of Deutsche Bank,

A.G., which shortly over one year ago became the owner and developer, through an affiliate, of another resort-casino under development on the Las Vegas Strip -- the Cosmopolitan Resort and Casino (the "Cosmopolitan") -- that will face stiff competition from the Fontainebleau Las Vegas once it commences operations.

11.     Deutsche Bank was originally the Cosmpolitan's lender, and acquired the project in mid-2008 in a foreclosure, following the borrower's default, for approximately one billion dollars.  To further its own interests as the Cosmopolitan's owner and developer, Deutsche Bank is now seeking to destroy the Fontainebleau in order to minimize competition with the Cosmopolitan project.  To that end, Deutsche Bank has sought to persuade other Revolver Banks to breach their commitments and has worked aggressively to discourage other Revolver Banks from working out their differences with Fontainebleau.  In so doing, Deutsche Bank has breached the covenant of good faith and fair dealing that is implied by law in every contract that, like the loan agreement here, is governed by New York law.

12.     Deutsche Bank's misconduct is more than just a breach of its contractual obligations.  To serve its own conflicting interest in ensuring the success of Cosmopolitan, Deutsche Bank has induced other Revolver Banks to breach their own commitments -- which, under the loan agreement, are separate and independent obligations.  Accordingly, Deutsche Bank is liable for tortious interference with the other Revolver Banks' contractual obligations.

### JURISDICTION AND VENUE

13.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 157(b) and 1334(b).  This adversary proceeding relates to the above-captioned Bankruptcy Cases now pending before this Court under chapter 11 of title 11 of the United States

Code.  Pursuant to 28 U.S.C. § 1409(a), venue properly lies in this District where Fontainebleau's chapter 11 case is pending.

14.    This adversary proceeding is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (K), (M), and (O) and 11 U.S.C. § 542.

**PARTIES**

15.    Fontainebleau is a Nevada limited liability company, with its principal place of business at 2827 Paradise Road, Las Vegas, Nevada 89109.  Plaintiff is also the successor by merger to Fontainebleau Las Vegas II, LLC, a Florida limited liability company.

16.    Defendant Bank of America, N.A. ("Bank of America"), is a nationally chartered bank with its main office in Charlotte, North Carolina.  Bank of America is committed to fund $100 million under the Revolving Loan.

17.    Defendant Merrill Lynch Capital Corporation is a Delaware corporation with a principal place of business in New York.  Merrill Lynch Capital Corporation, which is now indirectly owned by Bank of America, is committed to fund $100 million under the Revolving Loan.

18.    Defendant JPMorgan Chase Bank, N.A. is a nationally chartered bank with its headquarters in New York, New York.  JPMorgan Chase Bank, N.A is committed to fund $90 million under the Revolving Loan.

19.    Defendant Barclays Bank PLC is a public limited company in the United Kingdom with its principal place of business in London, England.  Barclays Bank PLC is committed to fund $100 million under the Revolving Loan.

20.    Defendant Deutsche Bank is a New York State-chartered bank with its principal office in New York, New York.  Deutsche Bank is committed to fund $80 million under the Revolving Loan.

21.    Defendant The Royal Bank of Scotland PLC is a banking association organized under the laws of the United Kingdom with a branch in New York, New York.  The Royal Bank of Scotland PLC is committed to fund $90 million under the Revolving Loan.

22.    Defendant Sumitomo Mitsui Banking Corporation New York is a Japanese corporation with offices in New York, New York.  Sumitomo Mitsui Banking Corporation New York is committed to fund $90 million under the Revolving Loan.

23.    Defendant Bank of Scotland is chartered under the laws of Scotland, with its principal place of business in Edinburgh, Scotland.  Bank of Scotland is committed to fund $72.5 million under the Revolving Loan.

24.    Defendant HSH Nordbank AG, New York Branch is a German banking corporation with a branch in New York, New York.  HSH Nordbank AG, New York Branch is committed to fund $40 million under the Revolving Loan.

25.    Defendant MB Financial Bank, N.A. is a nationally chartered bank with its main office in Chicago, Illinois.  MB Financial Bank, N.A. is committed to fund $7.5 million under the Revolving Loan.

**THE FACTS**

A.    **The Fontainebleau Las Vegas Project**

26.    The "Fontainebleau" brand is one of the most high-profile names in the lodging industry today, known for combining striking design, contemporary art, music, fashion and technology into a vibrant and unique guest experience.  The Project seeks to leverage the name

recognition and brand value associated with the Fontainebleau Miami Beach hotel, an iconic property that recently reopened, after a one billion dollar investment, to enormous publicity, rave reviews and receipt of the 2008 Americas Lodging Investment Summit (ALIS) award for Development of the Year.  Even under the present economic environment, Fontainebleau Miami Beach is performing at the top of its competitive set.

27.    The Project is designed to be a destination casino-resort on the north end of the Las Vegas Strip, situated on approximately 24.4 acres.  The Project consists of a 63-story glass skyscraper featuring over 3,800 guest rooms, suites and condominium units; a 100-foot high three-level podium complex housing casino/gaming areas, restaurants and bars, a spa and salon, a live entertainment theater and a rooftop pool; and a 353,000 square-foot convention center.

28.    The Project will also feature high-end retail space (the "Retail Space") of approximately 286,500 square-feet including retail shops, restaurants, and a nightclub.  The Retail Space is being developed by indirect subsidiaries of Fontainebleau's parent company ("Fontainebleau Retail"), funded by separate loans (the "Retail Financing").

29.    Plaintiff broke ground on the Project in January 2007, and today the Project is approximately 70% complete.

**B.    The Lenders And The Loan Agreements**

30.    On June 6, 2007, Plaintiff entered into a credit agreement (the "Credit Agreement") with a syndicate of lenders, including Bank of America as administrative agent (the "Administrative Agent") and disbursement agent (the "Disbursement Agent"), whereby the Banks and other lenders agreed to loan $1.85 billion under three senior secured credit facilities (collectively, the "Credit Facilities").  The first was a $700 million dollar term loan facility with a seven-year maturity (the "Initial Term Loan").  The second was a $350 million dollar delay

draw term loan facility with a seven-year maturity (the "Delay Draw Term Loan").  The third, intended to enable Plaintiff to complete construction and open the Project, was the $800 million Revolving Loan with a six-year maturity.  (Two revolver lenders, with total commitments of $30 million --- one of which is in FDIC receivership --- are not parties to the present action.) Plaintiff also issued $675 million in second-mortgage notes with an eight-year maturity (the "Notes").  As is customary in such financings, and as the Revolver Banks understood, Fontainebleau entered into these loan agreements with the expectation that the revenue generated by the completed Project would permit it to satisfy its repayment obligations.

31.    Also on June 6, 2007, Fontainebleau, certain of its affiliates, and the Project's lenders, including the Revolver Banks, entered into the disbursement agreement (the "Disbursement Agreement").  The Disbursement Agreement sets forth the order of funding under the Credit Facilities, the Notes, and the Retail Financing, and the related conditions to providing Fontainebleau with advances under the various facilities.

32.    The $700 million Initial Term Loan was funded in full upon execution of the Credit Agreement.  To date, $336.7 million of the $350 million Delay Draw Term Loan has been funded.

33.    The credit facilities provide two related mechanisms for funding the Project. First, the submission of a notice of borrowing ("Notice of Borrowing") obligates the Banks to transfer the requested funds into an account (the "Bank Proceeds Account") that is subject to the Disbursement Agreement.  Second, Fontainebleau must submit an advance request ("Advance Request"), typically monthly, to secure disbursements from the Bank Proceeds Account that it can then use to pay the costs of the Project.

34.     As consideration for their promise to provide Fontainebleau with financing when called upon to do so, the Revolver Banks were paid tens of million of dollars in fees at the June 2007 closing.  In particular, defendants Bank of America, Merrill Lynch, Deutsche Bank, and Barclays PLC served as co-lead arrangers and joint underwriters with respect to the Credit Facilities, and were compensated accordingly.

35.     In addition to these fees, several of the Revolver Banks have also been the beneficiaries of billions of dollars in federal TARP funds that are intended, as then-Treasury Secretary Paulson has explained, to induce banks to "deploy, not hoard, their capital.  And we expect them to do so ....".  For example, defendant Bank of America has received $52.5 billion dollars in government assistance to date, JPMorgan Chase $25 billion, and MB Financial Bank N.A. $196 million.  But instead of deploying their capital, the Revolver Banks have reneged on their existing commitments to Fontainebleau.

**1.      The Credit Agreement**

36.     Under the Credit Agreement, the Revolver Banks are obligated to disburse loan proceeds into the Bank Proceeds Account upon receiving from Fontainebleau a Notice of Borrowing specifying the amount of the Revolving Loan requested.

37.     The Credit Agreement also sets forth the only conditions to the Revolver Banks' funding obligation in response to a Notice of Borrowing.  Section 2.1(c) of the Credit Agreement provides that "[t]he making of Revolving Loans which are Disbursement Agreement Loans to the Bank Proceeds Account shall be subject **only** to the fulfillment of the applicable conditions set forth in Section 5.2 ...." (Emphasis in original.)

38.     Under Section 5.2 of the Credit Agreement, the only pertinent conditions to the Revolver Banks' obligations to fund the Revolving Loans are:

10

(a) <u>Notice of Borrowing</u>.  Borrowers shall have submitted a Notice of Borrowing specifying the amount and Type of the Loans requested, and the making thereof shall be in compliance with the applicable provisions of Section 2 of this Agreement.

. . .

(c) <u>Drawdown Frequency</u>.  Except for Loans made pursuant to Section 3 with respect to Reimbursement Obligations, Loans made pursuant to this Section shall be made no more frequently than once every calendar month unless the Administrative Agent otherwise consents in its sole discretion.

No representations, warranties, or certifications are required, and the lack of an Event of Default as defined in Section Eight of the Credit Agreement is not a condition precedent.  In any event, no such Event of Default has occurred here.

## 2.    **The Disbursement Agreement**

39.    The Disbursement Agreement sets forth Fontainebleau's material obligations to develop, construct and complete the Project, and Fontainebleau Retail's obligation to develop, construct and complete the Project's retail component.  The Disbursement Agreement also establishes the conditions to, and the relative sequencing of, disbursements from the proceeds of, among other things, the Revolving Loan, the Retail Financing and the Notes.  The Disbursement Agreement also establishes the obligations of the various agents to make disbursements to Fontainebleau of loan proceeds from the Bank Proceeds Account.

## C.    **Defendants' Breaches Under the Loan Agreements**

40.    The Revolver Banks have repeatedly breached their obligations under the Credit Agreement.

11

### 1.    Refusal To Honor The March 2009 Notice of Borrowing

41.    On March 2, 2009, Fontainebleau submitted a Notice of Borrowing for all of the funds remaining in the senior credit facilities, comprising $350 million under the Delay Draw Term Loan and $670 million under the Revolving Loan (the "March 2 Notice").  Under the Credit Agreement, funding under the March 2 Notice was required by the next day, March 3, 2009.

42.    Instead, the next day, Bank of America, as Administrative Agent, notified Fontainebleau by letter (the "March 2 Bank Letter") that it would not process the March 2 Notice, purportedly because it did not comply with Section 2.1(c) (iii) of the Credit Agreement, which provides that "unless the Total Delay Draw Commitments have been fully drawn, the aggregate outstanding principal amount of all Revolving Loans and Swing Line Loans shall not exceed $150,000,000."

43.    That same day, Fontainebleau advised Bank of America by letter that the March 2 Bank Letter was in error and urged Bank of America to reconsider (the "March 3 Letter"). Plaintiff also submitted an amended Notice of Borrowing to correct a scrivener's error, clarifying that the amount sought under the Revolving Loan was actually $656.52 million (the "March 3 Notice").  As the March 3 Letter correctly explained, the Credit Agreement only limits the amount of the Revolving Loan that can be outstanding unless the Term Loan has been fully drawn; it does not prohibit a Notice of Borrowing that -- like the March 2 Notice -- in fact does fully draw down the Term Loan such that the Notice can also draw upon more than $150,000,000 under the Revolving Commitments.  By fully drawing the Term Loan, the Notice of Borrowing itself removed the limitation on the amount of the Revolving Loan that may be drawn.

44.     On March 4, 2009, Bank of America again wrote to Fontainebleau stating that it had formed an ad hoc steering committee (the "Steering Committee") with other lenders (purportedly constituting a majority in interest of the lenders under the Credit Agreement) and that this unspecified self-selected group of lenders "unanimously" concurred that the March 2 Notice did not conform to the Credit Agreement requirements.

45.     Fontainebleau responded in a March 6, 2009 letter (the "March 6 Letter"), again pointing out that the interpretation of the Credit Agreement advanced by Bank of America was incorrect.  Certain other lenders under the Credit Agreement advised Fontainebleau that they also disagreed with the Steering Committee's interpretation.

46.     In light of the ongoing need to pay for the costs of the Project, Fontainebleau submitted an amended Notice of Borrowing on March 9, 2009 (the "March 9 Notice"), drawing only the $350 million remaining under the Term Loan.  Fontainebleau specifically reserved its right to contest the Administrative Agent's decision to deny, and the Revolver Banks' refusal to provide, funding under the Revolving Loan.

47.     Section 1.1 of the Credit Agreement defines a "Lender Default" as "the failure or refusal (which has not been retracted in writing) of a Lender to make available (i) its portion of any Loan required to be made by such Lender hereunder…"

48.     The Revolver Banks' failure and refusal to fund the Revolving Loan in response to the March 2 Notice and March 3 Notice is a Lender Default under the express terms of the Credit Agreement.

    **2.      Improper "Termination" Of The Revolving Loan Commitments**

49.     At or about the time that Bank of America informed Fontainebleau that various lenders had formed the Steering Committee, certain of the Revolver Banks determined that they

would not honor their commitments to Fontainebleau, and began to seek a pretext on which to renege.  On March 6, 2009, Bank of America sent Fontainebleau, on behalf of the Steering Committee, a letter purporting to raise certain questions and seek information about the Project, and proposing a meeting and tour of the Project.  In response, on March 16, 2009, Fontainebleau advised Bank of America that it would host such a meeting, but that neither holding such a meeting nor providing such information was a condition precedent to the Banks' compliance with the Notice of Borrowing, and that accordingly the Revolver Banks were still in default with respect to the March 2 and March 3 Notices.

50.    A meeting was held at the Project site on March 20, 2009, attended by certain Revolver Banks and other lenders.  At the meeting, Fontainebleau provided the lenders with a presentation about the Project, additional information, and a site tour.

51.    On March 25, 2009, Fontainebleau finalized the documentation in support of its March Advance Request.  Bank of America, as Disbursement Agent, authorized the release of $138 million from the Bank Proceeds Account.

52.    Shortly thereafter, in early April, Fontainebleau began gathering the relevant data to be submitted in connection with its April Advance Request.  As part of this process, Fontainebleau determined that, under the definitions and criteria in the Credit Agreement and Disbursement Agreement, the remaining costs to complete the Project (the "Remaining Costs") appeared to exceed the available loan funds ("Available Funds"), and as a result the Project at that time likely could not satisfy the test that remaining costs and available funds be in balance (the "In Balance Test"), as required under the Disbursement Agreement.

53.    On April 13, 2009, Fontainebleau provided its lenders with notice, pursuant to the Disbursement Agreement and other loan documents (the "April 13 Notice") that as of that date, it

did not believe that the Project satisfied the In Balance Test.  The April 13 Notice made no reference whatsoever to the March Advance Request.  Under the Disbursement Agreement, failure to satisfy the In Balance Test is <u>not</u> an Event of Default, and does not preclude the submission and funding of a Notice of Borrowing; at most, it only delays the ability to draw funds from the Bank Proceeds Account, pursuant to an Advance Request, to pay the costs of the Project.

54.     Following the April 13 Notice, Fontainebleau and its lenders (including the Revolver Banks) held a meeting on Friday, April 17, in New York, to discuss the status of the Project and plans for its completion.  On Monday, April 20, as a follow-up to that meeting, the Steering Committee's counsel sent a letter on behalf of "a number of Steering Committee institutions," including certain Revolver Banks, to Fontainebleau's counsel (the "April 20 Letter").  The April 20 Letter requested additional information based on the April 17 meeting, including "[a]n assessment of the March In Balance Test" -- an implicit concession that these lenders did not believe they had sufficient information to determine whether the In Balance Test had been satisfied as of March.

55.     Only hours later, and before any response by Fontainebleau, the Revolver Banks sent Fontainebleau a letter (the "Termination Letter") asserting that "one or more Events of Default have occurred" under the Credit Agreement, but utterly failing to identify any particular Event of Default.  The Termination Letter also contended that the Total Revolving Commitments -- <u>i.e.</u>, the $800 million Revolving Loan commitments (less the $10 million that is the subject of an FDIC receivership, and which is not at issue here) -- were "terminated effective immediately."

56.     The next day, April 21, 2009, Fontainebleau's counsel advised the Revolver Banks' counsel by letter that there had been no Event of Default under the Credit Agreement, that

the Termination Letter was ineffective and a nullity, and that unless the Revolver Banks

withdrew the Termination Letter immediately, Fontainebleau would pursue all available

remedies.

### 3.    Refusal To Honor The April 21, 2009 Notice of Borrowing

57.    Also on April 21, 2009, Fontainebleau provided Bank of America, as

Administrative Agent, with a Notice of Borrowing (the "April 21 Notice") that complied with all

applicable conditions under the Credit Agreement, seeking $710 million in Revolving Loans.

The amount of the Notice of Borrowing -- $710 million -- reflects certain adjustments to the full

$790 million in Revolver Loan commitments (net of the $10 million commitment in FDIC

receivership) that do not alter or diminish Fontainebleau's right to those total commitments.

Under the Credit Agreement, the April 21 Notice was required to be funded by 12:00 noon on

April 23, 2009.

58.    The Revolver Banks have once again breached their obligations under the Credit

Agreement by failing to honor the April 21 Notice.

### D.    The Revolver Banks' Breaches Will Cause Irreparable Harm To Plaintiff And The Las Vegas Economy.

59.    The Revolver Banks' breach of their obligations will cause extensive and

irreparable harm to Plaintiff.

60.    The Project is roughly 70% complete, and significant work remains to be

performed.  The Project has now been deprived of access to at least $710 million in financing

that is crucial to completion.  Without these funds -- which cannot be replaced in today's

economic environment -- the Project cannot be finished and will never open.  Construction will

cease, contractor liens will accrue, and revenues from the Project will never be realized.

61.     A collapse of the Project -- caused by the Revolver Banks' failure to fund -- would trigger similar consequences with respect to the Fontainebleau Retail development.

62.     Furthermore, the goal of the development of the Project was to build a unique destination casino-resort which would translate the successful Fontainebleau image, brand and reputation earned in Miami to the Las Vegas Strip.  The Project thus was intended to expand further the Fontainebleau brand and generate new business opportunities.  The Revolver Banks' breach of their commitments and resulting failure of the Project will substantially tarnish Fontainebleau's business, brand image, and reputation.

63.     The Revolver Banks' breach of their obligations will also cause extensive and irreparable harm to Clark County and the Las Vegas economy.  Currently, southern Nevada faces one of the most significant economic challenges in its modern history.  Unemployment has spiked to more than 10 percent and the annual job loss rate is 4.8 percent and climbing.  Southern Nevada's hotels and casino-hotels directly employed an average of 176,100 workers in 2008 but as of January 2009 this number fell to 164,700 -- a loss of 11,400 jobs.  It is undeniable that the interest of the public is best served by the completion of the Project.  If the Revolver Banks' breach forces the Project to shut down, there would be a profound impact on the community and the already reeling Las Vegas economy.

64.     At the upcoming peak of its construction cycle, the Project is expected to employ more than 5,000 workers and generate nearly $41 million dollars per month in wages and benefits to southern Nevada households.  Under the current plans, the finished Project will employ over 6,000 people directly and an additional 2,000 indirect regional jobs.  Moreover, the Project would result in substantial public revenues, including property tax payments of $1.1 million per acre per year and $73 million dollars in tax and fee payments annually.

65. The failure of the Revolver Banks to honor their financial commitments to the Project places the completion of this hotel and casino in serious jeopardy. Should the Project fail, the aforementioned benefits would not be realized, thousands of jobs would be lost, millions of dollars in tax revenue would evaporate, and Clark County would likely sink further into economic recession.

###### E.    Plaintiff Has No Adequate Remedy At Law

66. Specific performance of the Revolver Banks' obligations is required, and entirely appropriate, because Plaintiff lacks an adequate remedy at law.

67. Damages would not be an adequate remedy at law because alternative financing cannot be obtained. The terms of the Revolving Loan negotiated in June 2007 cannot be replicated in today's financial markets, and $770 million in comparable revolver financing for a Las Vegas construction project cannot be obtained.

68. Specific performance is also appropriate because the Project concerns real property. No other parcel of land, and no other development, could possibly substitute for the Fontainebleau Las Vegas. If the Revolver Banks' breaches cause Fontainebleau to lose the Project, that loss cannot adequately be remedied in damages.

69. The harm to Fontainebleau is also irreparable because the Banks' wrongdoing threatens to damage Fontainebleau's reputation and brand image. These highly valuable assets are being and will be harmed by the Revolver Banks' spurious claim that an Event of Default has occurred; that reputational and business harm cannot be undone.

F.    **Plaintiff's Bankruptcy Proceeding**

70.    On June 9, 2009, the Plaintiff filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code along with two of its affiliates (the "Chapter 11 Cases").

71.    Since the Petition Date, the Debtors have been operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

72.    As of the date hereof, no creditors' committee has been appointed or designated in these cases.  In addition, no request for the appointment of a trustee or examiner has been made.

## FIRST CLAIM FOR RELIEF

**(Breach of the Credit Agreement -- Against All Revolver Banks
Failure to Fund the Revolving Loans in March 2009)**

73.    Fontainebleau realleges and incorporates each and every allegation contained in paragraphs 1 through 72 hereof.

74.    The Credit Agreement is a valid and binding contract, pursuant to which the Revolver Banks agreed to fund $800 million in Revolving Loans.

75.    The March 2 Notice, as amended by the March 3 Notice (together, the "March Notice of Borrowing") submitted by Fontainebleau complied with all applicable conditions under the Credit Agreement.  At the time of the March Notice of Borrowing, Fontainebleau had performed all obligations required of it to be performed.

76.    Pursuant to the terms of the Credit Agreement, the Revolver Banks were, and continue to be, obligated to honor the March Notice of Borrowing.

77.    The Revolver Banks' failure to honor the March Notice of Borrowing constitutes a material breach of their obligations under the Credit Agreement.

78.     By refusing to comply with their obligations under the Credit Agreement, the Revolver Banks have also breached the covenant of good faith and fair dealing implied in every contract that, like this one, is governed by New York law.

79.     There is a real and substantial controversy between Fontainebleau, on the one hand, and the Revolver Banks, on the other hand.  Expeditious resolution of this controversy is both necessary and appropriate.

80.     Fontainebleau has no adequate remedy at law for the Revolver Banks' breaches, and will be irreparably harmed thereby.

81.     Accordingly, Fontainebleau is entitled to a decree of specific performance compelling the Banks to provide the Revolving Loans in accordance with the March Notice of Borrowing.

82.     While damages would not adequately compensate Plaintiff for the harm caused by the Revolver Banks' breaches, Plaintiff also is entitled to damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### (Breach of the Credit Agreement -- Against All Revolver Banks Improper Termination of Commitments)

83.     Fontainebleau realleges and incorporates each and every allegation contained in paragraphs 1 through 82 hereof.

84.     The Credit Agreement is a valid and binding contract, pursuant to which the Revolver Banks and other revolver lenders agreed to fund $800 million in Revolving Loans.

85.     In the Termination Letter, the Revolver Banks have taken the position that as of April 20, 2009, one or more Events of Default have occurred.  The Revolver Banks failed to identify any such Event of Default.

86.    No Event of Default under the Credit Agreement has occurred, and the Termination Letter is ineffective and a nullity.  By repudiating their obligations, the Revolver Banks have breached the Credit Agreement.

87.    There is thus a real and substantial controversy between Fontainebleau, on the one hand, and the Revolver Banks, on the other hand, as to the validity of the Termination Letter. Expeditious resolution of this controversy is both necessary and appropriate.

88.    Accordingly, Fontainebleau is entitled to a judgment declaring that as of April 21, 2009, (i) no Event of Default had occurred under the Credit Agreement; (ii) the Credit Agreement was in full force and effect, including with respect to the Revolver Banks, and (iii) the Termination Letter was ineffective and a nullity.

89.    Fontainebleau has no adequate remedy at law for the Revolver Banks' breaches, and will be irreparably harmed thereby.

90.    Accordingly, Fontainebleau is entitled to a decree of specific performance compelling the Banks to continue to comply with their obligations under the Credit Agreement.

91.    While damages would not adequately compensate Fontainebleau for the harm caused by the Revolver Banks' breaches, Fontainebleau also is entitled to damages in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### (Breach of the Credit Agreement -- Against All Revolver Banks
### Failure to Fund the Revolving Loans in April 2009)

92.    Fontainebleau realleges and incorporates each and every allegation contained in paragraphs 1 through 91 hereof.

93.    The Credit Agreement is a valid and binding contract, pursuant to which the Revolver Banks and other revolver lenders agreed to fund $800 million in Revolving Loans.

94.     The April 21 Notice of Borrowing submitted by Fontainebleau complied with all applicable conditions under the Credit Agreement.  At the time of the April 21 Notice, Fontainebleau had performed all obligations required of it to be performed.

95.     Pursuant to the terms of the Credit Agreement, the Revolver Banks were, and continue to be, obligated to honor the April 21 Notice.

96.     The Revolver Banks' failure to honor the April 21 Notice constitutes a material breach of their obligations under the Credit Agreement.

97.     By refusing to comply with their obligations under the Credit Agreement, the Revolver Banks have also breached the covenant of good faith and fair dealing implied in every contract that, like this one, is governed by New York law.

98.     There is a real and substantial controversy between Fontainebleau, on the one hand, and the Revolver Banks, on the other hand.  Expeditious resolution of this controversy is both necessary and appropriate.

99.     Fontainebleau has no adequate remedy at law for the Revolver Banks' breaches, and will be irreparably harmed thereby.

100.     Accordingly, Fontainebleau is entitled to a decree of specific performance compelling the Banks to provide the Revolving Loans in accordance with the April 21 Notice.

101.     While damages would not adequately compensate Fontainebleau for the harm caused by the Revolver Banks' breaches, Fontainebleau also is entitled to damages in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF

### (Equitable Estoppel -- Against All Revolver Banks)

102.    Fontainebleau realleges and incorporates each and every allegation contained in paragraphs 1 through 101 hereof.

103.    The Revolver Banks led Fontainebleau to believe that they would comply with their obligations to provide the Revolving Loans by, among other things, continuing to engage in dialogue as to the status of the project, requesting information from Fontainebleau, attending meetings with Fontainebleau, and otherwise acting as if they still intended to perform under the Credit Agreement.  At no time prior to April 20, 2009 did the Revolver Banks state or give any indication that they believed an Event of Default had occurred.

104.    In this manner, the Revolver Banks confirmed to Fontainebleau that they would provide the Revolving Loans when presented with a compliant Notice of Borrowing, and concealed the material fact that they had already determined not to perform their obligations. The Revolver Banks intended, or reasonably should have expected, that Fontainebleau would rely on their representations and omissions. In relying on the legitimate expectation of ongoing funding, Plaintiff continued to incur substantial construction-related expenses and make ongoing commitments to vendors and other tradespeople and its employees.

105.    Fontainebleau thus relied on the Revolver Banks' representations to its detriment, by incurring millions of dollars of costs and committed spending based on the expectation that the Revolver Banks would honor their commitments and fund those expenditures.  Fontainebleau did not know, and had no way of knowing, that the Revolver Banks were planning to breach the Credit Agreement.

106.    As a direct and proximate cause of the Revolver Banks' failure to honor their own representations regarding the Revolving Loans, Fontainebleau has been injured.

107.    Accordingly, although monetary damages would be inadequate to compensate Fontainebleau for its injury, Fontainebleau is entitled to damages, including consequential damages, in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF

**(Breach of Implied Covenant of Good Faith and Fair Dealing
Under the Credit Agreement -- Against Deutsche Bank)**

108.    Fontainebleau realleges and incorporates each and every allegation contained in paragraphs 1 through 107 hereof.

109.    The Credit Agreement is a valid and binding contract, pursuant to which the Revolver Banks and other revolving lenders agreed to fund $800 million in Revolving Loans.

110.    New York law, which governs the Credit Agreement, implies in all contracts a covenant of good faith and fair dealing in the course of performance.  The purpose of this covenant is to ensure that parties to a contract will not destroy or injure the right of another party to enjoy the fruits of the contract.

111.    Pursuant to that implied covenant, Deutsche Bank, as a party to the Credit Agreement, owed and owes Fontainebleau a duty of good faith and fair dealing.

112.    Deutsche Bank has encouraged other Revolver Lenders to breach their obligations under the Credit Agreement.  Deutsche Bank has also sought to undermine other Revolver Lenders' attempts to resolve the pending dispute between the Fontainebleau and the Revolver Lenders.  In so doing, Deutsche Bank has breached the covenant of good faith and fair dealing that is implied by law in the Credit Agreement.

113.     Deutsche Bank's motive for taking these steps results from its conflicted position as an affiliate of the owner and developer of the Cosmopolitan Resort and Casino (the "Cosmopolitan"), another Las Vegas Strip resort-casino construction project. The Cosmopolitan is a resort casino and condo project located on the Las Vegas strip that broke ground in the fall of 2005 and is currently scheduled to open in the second quarter of 2010.  Like the Fontainebleau, the Cosmopolitan is expected to feature approximately 3,000 residential and hotel units, an 80,000 square foot casino; 265,000 square feet of retail and restaurant space; a 40,000 square foot spa and fitness facility; a theater; and 150,000 square feet of meeting/convention space.

114.     Deutsche Bank and its affiliates originally were involved in the Cosmopolitan project as a lender, starting in 2003 when Ian Bruce Eichner, the owner/developer, sought financing from Deutsche Bank or its affiliates to purchase the land on the Las Vegas Strip.  As the Cosmopolitan project moved forward, this Deutsche Bank financing increased on more than one occasion.  In January 2008, when Eichner was unable to raise additional equity, he defaulted on the $760 million dollar construction loan from Deutsche Bank.

115.     Deutsche Bank subsequently foreclosed on the Cosmopolitan and, in late summer/early fall of 2008, Nevada Property I, LLC, an affiliate of Deutsche Bank, purchased the Cosmopolitan --nominally a $3.9 billion dollar project -- for $1 billion dollars in a foreclosure sale.  The property is now held by a subsidiary and is financed through a loan from Deutsche Bank AG.

116.     The Project, when completed, will be a strong competitor with Cosmopolitan. And Deutsche Bank's more than one billion dollar ownership stake in Cosmopolitan far exceeds its commitment to Fontainebleau, providing Deutsche Bank with a strong incentive to undermine Fontainebleau's development and future prospects.

117.    As a result of Deutsche Bank's interest in Cosmopolitan, Deutsche Bank is not only trying to circumvent its contractual obligations to Fontainebleau but has actively encouraged other Revolver Lenders, and continues to encourage them, to breach their commitments to the Project, all in violation of the implied covenant of good faith and fair dealing.

118.    Fontainebleau has been, and continues to be, directly and proximately harmed as a result of Deutsche Bank's misconduct.

119.    Accordingly, Fontainebleau seeks an injunction restraining Deutsche Bank from continuing its violations of the duty of good faith and fair dealing as set forth above.  In addition, although monetary damages would be inadequate to compensate Fontainebleau for its injury, Fontainebleau is entitled to damages from Deutsche Bank in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### (Intentional Interference with Contractual Relations -- Against Deutsche Bank)

120.    Fontainebleau realleges and incorporates each and every allegation contained in paragraphs 1 through 119 hereof.

121.    The Credit Agreement is a valid and binding contract, pursuant to which the Revolver Banks and other revolver lenders agreed to fund $800 million in Revolving Loans.

122.    Pursuant to the terms of the Credit Agreement, Fontainebleau has a contractual relationship with each Revolver Bank as a lender to the agreement.

123.    The Credit Agreement expressly states that the obligations of the various lenders thereunder, including each Revolver Bank, are several and not joint.  Thus, as the Credit Agreement makes clear, "[t]he failure of any Lender to make any Loan, to fund any such participation or make any payment ... shall not relieve any other Lender of its corresponding

26

obligation ....." Accordingly, each Revolver Bank has a separate and independent obligation to fund its own commitment under the Revolving Loan.

124.    As a result, a breach by one Revolver Bank does not eliminate the obligation of any other Revolver Bank to satisfy its commitments under the contract.

125.    Deutsche Bank, as a Revolver Bank, is aware of the Credit Agreement, of the other Revolver Banks' commitments,  and of the fact that these commitments are several and independent.

126.    Deutsche Bank has intentionally and without justification interfered in contractual relationships between Fontainebleau and the other Revolver Banks, and continues to do so, as alleged above, by encouraging them to breach their commitments and by interfering with attempts to resolve the dispute in recent and ongoing negotiations.

127.    These acts by Deutsche Bank were and are intended or designed to disrupt the contractual relationships between Fontainebleau and the other Revolver Lenders and cause the failure of the Project, all to the economic benefit of Deutsche Bank and its Cosmopolitan project.

128.    Deutsche Bank was motivated to destroy the Project, and injure Fontainebleau, to benefit the Cosmopolitan, the competing construction project in which Deutsche Bank has a vastly larger financial stake.

129.    As a direct and proximate cause of Deutsche Bank's interference in the contractual relationship between Fontainebleau and the other Revolver Lenders, the other Revolver Lenders have breached the agreement and terminated their commitments, and Fontainebleau has been injured.

130.    Accordingly, Fontainebleau seeks an injunction restraining Deutsche Bank from continued interference with Fontainebleau's contractual relations, as set forth above.  In addition,

although monetary damages would be inadequate to compensate Fontainebleau for its injury, Fontainebleau is entitled to damages from Deutsche Bank in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

### (Turnover Pursuant to 11 U.S.C. § 542)

131.    Fontainebleau realleges and incorporates each and every allegation contained in paragraphs 1 through 130 hereof.

132.    The Credit Agreement is a valid and binding contract, pursuant to which the Revolver Banks and other revolving lenders agreed to fund $800 million in Revolving Loans.

133.    The March Notice of Borrowing submitted by Fontainebleau complied with all applicable conditions under the Credit Agreement.  At the time of the March Notice of Borrowing, Fontainebleau had performed all obligations required of it to be performed.

134.    Pursuant to the terms of the Credit Agreement, the Revolver Banks were, and continue to be, obligated to honor the March Notice of Borrowing.

135.    Pursuant to the March Notice of Borrowing, the Revolver Banks were required to fund Fontainebleau their *pro rata* shares of $656.5 million.

136.    The Revolver Banks failed to honor the March Notice of Borrowing.

137.    The required funding under the March Notice of Borrowing constitutes property of the estate pursuant to 11 U.S.C. § 541(a).

138.    The required funding under the March Notice of Borrowing is property that Fontainebleau may use under 11 U.S.C. § 363.

139.    Pursuant to 11 U.S.C. § 542, the Revolver Banks are required to pay their *pro rata* shares of $656.5 million to Fontainebleau pursuant to the March Notice of Borrowing.

WHEREFORE, Fontainebleau demands judgment against the Revolver Banks, and each of them,

(a)    On the First, Second, Third and Fourth Claims for Relief, decreeing specific performance by the Revolver Banks of their obligations under the Credit Agreement and related documentation, including providing the Revolving Loans pursuant to the March 2 Notice of Borrowing and the April 21 Notice of Borrowing;

(b)    On the First, Second, Third, and Fourth Claims for Relief, awarding Fontainebleau damages in an amount to be determined at trial, but in no event less than three billion dollars;

(c)    On the Second Claim for Relief, declaring that as of April 21, 2009:  (i) no Event of Default had occurred under the Credit Agreement; (ii) the Credit Agreement was in full force and effect, including with respect to the Revolver Banks, and (iii) the Termination Letter was ineffective and a nullity;

(d)    On the Fifth Claim for Relief, enjoining Deutsche Bank from further violations of the duty of good faith and fair dealing under the Credit Agreement;

(e)    On the Sixth Claim for Relief, enjoining Deutsche Bank from further tortious interference in Fontainebleau's contractual relations;

(f)    On the Fifth and Sixth Claims for Relief, awarding damages against Deutsche Bank in an amount to be determined at trial;

(g)    On the Seventh Claim for Relief, awarding turnover of property of the estate in the amount of $656.52 million;

(h)    Awarding Fontainebleau the costs and disbursements of this action, including

attorneys' fees; and

(i)    Awarding Fontainebleau such other and further relief as this Court may deem just

and proper.

Dated:  June 10, 2009
Miami, FL

**I HEREBY CERTIFY that I am admitted to the Bar of the
United States District Court for the Southern District of Florida
and I am in compliance with the additional qualifications to
practice in this Court as set forth in Local Rule 2090-1(A).**

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
*Proposed Counsel to the Debtor*
200 South Biscayne Blvd., Suite 2500
Miami, Florida 33131
Telephone: (305) 374-7580
Facsimile:  (305) 374-7593

By:  /s/ Scott L. Baena
     Scott L. Baena
     Florida Bar No. 186445
     Mindy A. Mora
     Florida Bar No. 678910
     Jay M. Sakalo
     Florida Bar No. 156310

and

**KASOWITZ, BENSON, TORRES & FRIEDMAN LLP**
*Proposed Litigation Counsel to the Debtor*
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile:  (212) 506-1800
Marc E. Kasowitz
N.Y. Bar No. 1309871
*(pro hac vice pending)*
David M. Friedman
N.Y. Bar No. 2275758
*(pro hac vice pending)*
Jed I. Bergman
N.Y. Bar No. 2928349
*(pro hac vice pending)*