**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:                                                           Chapter 11

FONTAINEBLEAU LAS VEGAS                  (Jointly Administered)
HOLDINGS, LLC, ET AL.,[1]
                                                                 Case No.  09-21481-BKC-AJC

Debtors.
_____/

FONTAINEBLEAU LAS VEGAS LLC,

Plaintiff,

v.

BANK OF AMERICA, N.A., ET AL.,
                                                                 Adv. Pro. No.  09-01621-ap-AJC
         Defendants.
_____/


**FONTAINEBLEAU'S MOTION FOR (A) PARTIAL SUMMARY JUDGMENT ON
LIABILITY WITH RESPECT TO THE MARCH 2 NOTICE OF BORROWING; (B) AN
ORDER PURSUANT TO 11 U.S.C. §542 DIRECTING THE TURNOVER OF FUNDS TO
THE DEBTORS' ESTATE; AND (C) EXPEDITED FILING AND CONSIDERATION OF
THIS MOTION, AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

---

[1]       The last four digits of each Debtor's tax identification number are: (i) Fontainebleau Las Vegas Holdings,
LLC [9337], (ii) Fontainebleau Las Vegas, LLC [9332], and (iii) Fontainebleau Las Vegas Capital Corp. [7822].
The Debtors' current mailing address is 19950 West Country Club Drive, Aventura, Florida  33180.

Plaintiff Fontainebleau Las Vegas, LLC ("Fontainebleau") brings this motion for partial summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure 56 (the "Federal Rules") and Rule 7056 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), on the issue of liability with respect to the First Claim for Relief in the Complaint in this adversary proceeding. Fontainebleau seeks an order establishing that the defendant banks (the "Revolver Banks" or "Banks"[2]) breached the unambiguous terms of the governing June 6, 2007 Credit Agreement (the "Credit Agreement") when they failed to honor a properly tendered March 2, 2009 Notice of Borrowing, as amended by a March 3, 2009 Notice of Borrowing (the "March 2 Notice").

Fontainebleau also seeks an order, pursuant to 11 U.S.C. § 542, directing each of the Revolver Banks to turn over to the bankruptcy estate its *pro rata* share of the $656.5 million that was properly drawn by the March 2 Notice. These funds were due and owing on March 3, 2009 -- pre-petition -- and accordingly are property of the estate.

Finally, because the prompt resolution of this motion will materially enhance the disposition of this adversary proceeding and likely speed the overall resolution of these bankruptcy cases, Fontainebleau also seeks an order, pursuant to Rule 9006(c) of the Bankruptcy Rules, (a) reducing the twenty-day period after commencement of this action within which motions for summary judgment may be filed, pursuant to Bankruptcy Rule 7056 and Federal

---

[2]     The Revolver Banks are defendants Bank of America, N.A.; Merrill Lynch Capital Corporation; JPMorgan Chase Bank, N.A.; Barclays Bank PLC; Deutsche Bank Trust Company Americas; The Royal Bank of Scotland PLC; Sumitomo Mitsui Banking Corporation New York; Bank of Scotland; HSH Nordbank AG, New York Branch; and MB Financial Bank, N.A.

Rule 56, and (b) setting an expedited briefing schedule for this motion at the Court's earliest convenience.

Plaintiff bases this motion on the incorporated Memorandum of Law; the Affidavit of Jim Freeman and the Affirmation of Jed I. Bergman, both dated June 10, 2009, along with the attached exhibits, filed concurrently with this motion; and the existing record in this action.[3]

## PRELIMINARY STATEMENT

This motion seeks partial summary judgment determining that the defendant Revolver Banks -- lenders for the multi-billion-dollar Fontainebleau Las Vegas casino-resort development project (the "Project") -- breached the Credit Agreement by improperly rejecting Fontainebleau's March 2 Notice, which required the Banks to fund their *pro rata* shares of $656.5 million in binding loan commitments into a designated account to be used for the payment of Project costs. The Banks' default has deprived and continues to deprive the Project of critical financing to which Fontainebleau is contractually entitled.  Accordingly, the motion also seeks an order directing the Banks to turnover their *pro rata* shares of that $656.5 million as property of the estate, pursuant to 11 U.S.C. § 542.  The sole substantive issue on this motion -- whether the Banks' rejection of the March 2 Notice breached the Credit Agreement -- turns entirely on the interpretation of an unambiguous contractual provision, rendering it appropriate for summary judgment.

---

[3]        Citations to the Affidavit of Jim Freeman are in the format "Freeman Aff. ¶ __"; citations to the affidavit of Jed I. Bergman are in the format "Bergman Aff. ¶ __"; citations to exhibits are in the format "____ Aff. Ex. __ at __."  Citations to the Credit Agreement, which is Exhibit A to the Freeman Aff., are in the form "CA § __"; citations to the Disbursement Agreement (as defined below), which is Exhibit B to the Freeman Aff., are in the form "DA § __."  Citations to the Adversary Proceeding Amended Complaint in this action are in the format "Compl. ¶ __."

The facts giving rise to the motion are as follows.  The defendant Revolver Banks comprise a subset of the Project's lenders that are parties to the Credit Agreement and related agreements providing for, among other things, total term loan facilities totaling $1.05 billion, and a revolver loan totaling $800 million.[4]  Prior to March 2009, the term lenders had honored their obligations and funded $700 million out of their $1.05 billion commitment, with $350 million undrawn.  On March 2, 2009, pursuant to the Credit Agreement, Fontainebleau submitted a notice of borrowing that, as amended on March 3, 2009, drew upon the remaining $350 million in term loan funds, as well as $656.5 million in revolving loans.  Under the plain terms of the Credit Agreement, the Revolver Banks were obligated to fund their *pro rata* shares of that $656.5 million into a designated account by the specified "Borrowing Date," which was the next business day, March 3, 2009.

They did not.  Seeking to escape their commitments in a deteriorating credit market and declining economy, the Revolver Banks seized upon a deliberate misreading of the Credit Agreement to evade their obligations.  Rather than funding in response to the Notice of Borrowing, the Revolver Banks -- through Bank of America, the Administrative Agent under the Credit Agreement and itself a Revolver Bank, with commitments effectively totaling $200 million, or 25% of the total revolving facility[5] -- took the disingenuous position that the March 2 Notice did not comply with Section 2.1(c)(iii) of the Credit Agreement, which provides that "unless the Total Delay Draw Term Commitments have been fully drawn, the aggregate

---

[4]     The defendants in this adversary proceeding have total commitments of $770 million out of that $800 million.  One lender, with a $10 million commitment, is in FDIC receivership.  Another lender with a $20 million commitment, Camulos Master Fund, L.P., is not a party to this adversary proceeding.

[5]     Bank of America has a $100 million commitment of its own, plus another $100 million commitment by virtue of its acquisition of Merrill Lynch.

outstanding principal amount of all Revolving Loans . . . shall not exceed $150,000,000." According to Bank of America, the term loan had not yet been "fully drawn" as of the March 3 Borrowing Date, even though the March 2 Notice itself had fully drawn the remaining $350 million in term loan funds when it was submitted on March 2. Bank of America and the Revolver Banks' intentional and tortured misinterpretation of the Credit Agreement was purely pretextual: asserted in bad faith, for the sole purpose of attempting to avoid their funding obligations.

Faced with this improper rejection, but committed to the ongoing costs of the Project, Fontainebleau ultimately submitted a revised notice of borrowing for the term loan only -- a notice that was honored by the term lenders -- and fully reserved its rights with respect to the Revolver Banks. Since that time, the Revolver Banks have been, and continue to be, in default.

This motion thus presents a straightforward question of contract interpretation. The *only* stated justification for the Revolver Banks' refusal to fund was the March 2 Notice's purported failure to comply with Section 2.1(c)(iii) of the Credit Agreement, which provides that "unless the Total Delay Draw Term Commitments have been fully drawn, the aggregate outstanding principal amount of all Revolving Loans . . . shall not exceed $150,000,000." The plain and unambiguous meaning of this provision is that Revolving Loans in excess of $150 million cannot be "outstanding", "unless" the term loan commitments "have been fully drawn." Here, the remaining term loans were "fully drawn" on March 2, when the March 2 Notice was submitted -- thus satisfying this condition and allowing Revolving Loans in excess of $150 million to become outstanding when they were due on the Borrowing Date, the next day, March 3.

The contrary position espoused by Bank of America is apparently that the condition in Section 2.1(c)(iii) requires not only that the entire term loan be fully drawn (which occurred on

March 2), but also that the term loan already be *outstanding* (*i.e.*, actually funded), before a notice of borrowing for more than $150 million in Revolver Loans can be submitted. New York law, which governs the Credit Agreement, would reject that interpretation. The sophisticated parties and counsel that drafted this contract used the words "fully drawn," rather than "outstanding," deliberately. The Banks' view would erase this careful distinction by changing the "fully drawn" requirement to require that the term loan not merely be drawn, but also be "outstanding," thus stripping the words "fully drawn" of their meaning. That "reading" would also force Fontainebleau to submit two successive notices of borrowing where both the final term loans and revolver loans exceeding $150 million were required, even though the Credit Agreement limits such notices of borrowing to one per month -- a prospect that would threaten to leave Fontainebleau in default on its own obligations until such time as a second notice of borrowing could be submitted. The Banks' interpretation thus contravenes the plain meaning and purpose of the Credit Agreement, and is unsupportable.

Fontainebleau demonstrates below that there is only one reasonable construction of the Credit Agreement: a single notice of borrowing can "fully draw" the term loan, thus satisfying the contractual condition, and concurrently borrow against the revolver loan, such that more than $150 million becomes outstanding on the next business day. That is precisely what the March 2 Notice did. The Revolver Banks' refusal to honor it was a clear breach of the Credit Agreement. Accordingly, partial summary judgment on Fontainebleau's First Claim for Relief is warranted.

For the same reasons, an order should issue pursuant to 11 U.S.C. § 542 directing the Revolver Banks to turnover to the bankruptcy estate their *pro rata* shares of the $656.5 million that was properly drawn by the March 2 Notice. These funds were unconditionally due and

owing as of March 3, 2009 -- the Borrowing Date under the March 2 Notice, and well before the petition date -- and these funds are property of the estate.

Expedited consideration is appropriate as well.  This Court has the authority under Bankruptcy Rule 9006(c), in its discretion, to reduce applicable time periods.  Prompt adjudication of this motion will assist in the ultimate disposition of this case by establishing the Revolver Banks' breach, and Plaintiff's right to hundreds of millions of dollars in additional cash collateral subject to use under Section 363 of the Bankruptcy Code (the "Code").  Indeed, a favorable resolution of this litigation is the only means by which to obtain funding to complete construction of the Project.  Thus, although Bankruptcy Rule 7056 makes applicable Federal Rule 56, which provides that motions for summary judgment may be filed at any time after 20 days have passed from commencement of the action, Fontainebleau respectfully submits that this Court should shorten that period and permit the present motion to be filed forthwith.  There can be no conceivable claim by defendants of prejudice or surprise:  a virtually identical action against these same defendants has been pending in Nevada since April 2009.[6]  For similar reasons, this Court should set an expedited briefing schedule for disposition of this motion.

## PROCEDURAL HISTORY

On June 9, 2009, Fontainebleau and the other debtors in this bankruptcy proceeding filed voluntary petitions with this Court for relief under chapter 11 of the Code.  Fontainebleau

---

[6]    Fontainebleau previously commenced an action asserting these claims  in the District Court in Clark County, Nevada, on April 23, 2009.  Bergman Aff. Ex. A.  An amended complaint that is virtually identical to the present adversary proceeding was filed on May 12, 2009, adding two additional causes of action against defendant Deutsche Bank Trust Company Americas ("Deutsche Bank").  Bergman Aff. Ex. B.  On May 13, 2009, a subset of the Revolver Banks removed Fontainebleau's state action to the United States District Court of Nevada.  Bergman Aff. Ex. C.  On June 9, 2009, before any defendant had answered or otherwise responded to the amended complaint, plaintiff filed a voluntary Notice of Dismissal with the United States District Court of Nevada.  Bergman Aff. Ex. D.

commenced this adversary proceeding on June 9, 2009, seeking specific performance of the

Revolver Banks' funding obligations under the Credit Agreement, as well as damages. As noted,

a prior proceeding seeking substantially identical relief was previously pending in Nevada -- first

in District Court in Clark County, Nevada, then subsequently in Federal District Court for the

District of Nevada. That Nevada proceeding was withdrawn without prejudice

contemporaneously with the filing of this adversary proceeding. An Amended Complaint in this

action was filed on June 10, 2009. The First Claim for Relief in this adversary proceeding seeks

specific performance and damages with respect to the Revolver Banks' breach of the Credit

Agreement arising out of the March 2 Notice. The Seventh Claim for Relief seeks an order for

turnover of property of the estate pursuant to 11 U.S.C. § 542.

<u>**STATEMENT OF UNDISPUTED FACTS**</u>

The following statement of undisputed facts is based upon the Affidavit of Jim Freeman

and the Affirmation of Jed Bergman, both dated June 10, 2009, and the accompanying exhibits,

as well as the existing record in this action.

**A.** **The Fontainebleau Project**

1.      The plaintiff in this action is the owner/developer of the Project, a destination

casino-resort now under construction on the north end of the Las Vegas Strip. (Freeman Aff. ¶

4; Compl. ¶ 27)

2.      The Project is designed to consist of a 63-story glass skyscraper featuring over

3,800 guest rooms, suites and condominium units; a 100-foot high three-level podium complex

housing casino/gaming areas, restaurants and bars, a spa and salon, a live entertainment theater

and a rooftop pool; a 353,000 square-foot convention center; and high-end retail space including

shops, restaurants, and a nightclub. (Freeman Aff. ¶ 5; Compl. ¶¶ 27-28)

8

3.      Plaintiff broke ground on the Project in January 2007, and the Project is now 70% complete.  (Freeman Aff. ¶ 6; Compl. ¶ 29)

4.      The "Fontainebleau" brand is one of the most high-profile names in the lodging industry today.  (Freeman Aff. ¶ 7; Compl. ¶ 26)

**B.      The Credit Agreement And The Disbursement Agreement**

5.      The Credit Agreement between and among Fontainebleau, the Revolver Banks, Bank of America as administrative agent, and others, was entered into as of June 6, 2007.  (Freeman Aff. ¶ 8; CA p. 1; Compl. ¶ 30)

6.      The Credit Agreement provides for total commitments to the Project of $1.85 billion, under three senior secured credit facilities:  (1) a $700 million dollar term loan (the "Initial Term Loan"); (2) a $350 million dollar delay draw term loan (the "Delay Draw Term Loan"); and (3) the $800 million Revolving Loan that is at issue in this case.  (Freeman Aff. ¶ 9; CA § 1.1 pp. 22, 38, §2.1; Compl. ¶ 30)

7.      The Project is also financed by $675 million in second-mortgage notes (the "Notes"), along with separate financing for development of the Project's retail space (the "Retail Financing").  (Freeman Aff. ¶ 10; CA p.1; Compl. ¶ 30).

8.      The $700 million Initial Term Loan was funded in full upon execution of the Credit Agreement.  (Freeman Aff. ¶ 11; Compl. ¶ 32)

9.      To date, $336.7 million of the $350 million Delay Draw Term Loan has been funded.  The remaining $13.3 million reflects one lender that is in default, and a second lender that is in FDIC receivership and whose commitment that has been terminated.  (Freeman Aff. ¶ 12; Compl. ¶ 32)

10.     With the exception of letters of credit in the aggregate face amount of approximately $13.5 million, none of the remaining availability under the $800 million Revolving Loan is currently funded.  (Freeman Aff. ¶ 13)

11.     The Revolver Banks and the Project's other lenders, along with Fontainebleau and certain of its affiliates, are also parties to a disbursement agreement dated June 6, 2007 (the "Disbursement Agreement"). (Freeman Aff. ¶ 14; DA p. 1; Compl. ¶ 31)

12.     The Disbursement Agreement sets forth the order of funding under the Credit Facilities, the Notes, and the Retail Financing, and, as discussed immediately below, the related conditions to providing Fontainebleau with advances under the various credit facilities. (Freeman Aff. ¶ 15; DA pp. 1-2; Compl. ¶ 31)

**C.     Provisions Governing Funding The Project**

13.     The loan documents prescribe a two-step process for directing loan proceeds to pay Project costs:  (1) a Notice of Borrowing under the Credit Agreement, and (2) an Advance Request under the Disbursement Agreement.  (Freeman Aff. ¶ 16; CA § 2.4; DA § 2.4)

14.     First, under the Credit Agreement, Fontainebleau submits a notice of borrowing ("Notice of Borrowing") to the Administrative Agent specifying the amount and type of Loans being drawn and the requested borrowing date.  (Freeman Aff. ¶ 17; CA § 2.4)

15.     No representations, warranties, or certifications as to the status of the Project are required in connection with a Notice of Borrowing.  (Freeman Aff. ¶ 18; Compl. ¶ 38).

16.     Upon receipt of a Notice of Borrowing, the Administrative Agent is required to promptly notify "each Delay Draw Lender and/or Revolving Lender, as appropriate," that the Notice has been received.  (Freeman Aff. ¶ 19; CA § 2.4(b))

17.     After the Administrative Agent provides the Notice of Borrowing to the applicable lenders, each such lender is required to make its pro rata share of the requested

borrowing available to the Administrative Agent by 10:00 AM on the borrowing date (typically, but in no event earlier than, the next business day).  (Freeman Aff. ¶ 20; CA § 2.4(b))

18.     Under Section 2.4(c) of the Credit Agreement, the Administrative Agent is required -- upon satisfaction or waiver of the applicable conditions precedent specified in Section 2.1 of the Credit Agreement -- to remit the loan proceeds into an account (the "Bank Proceeds Account") that is subject to the Disbursement Agreement.  (Freeman Aff. ¶ 21; CA § 2.4)

19.     In addition to the "fully drawn" condition at issue on this motion, Section 2.1 of the Credit Agreement specifies that (i) each revolving lender's outstanding obligations cannot exceed that lender's total commitments, and (ii) the total revolving loans outstanding cannot exceed the total revolving commitments.  It further provides that the making of Revolving Loans to the Bank Proceeds Account in response to a Notice of Borrowing "shall be subject **only** to the fulfillment of the applicable conditions set forth in Section 5.2 . . . ."  (emphasis in original). (Freeman Aff. ¶ 22; CA § 2.1 (c))

20.     Under Section 5.2, the only pertinent "applicable conditions" are:

(a) <u>Notice of Borrowing</u>.  Borrowers shall have submitted a Notice of Borrowing specifying the amount and Type of the Loans requested, and the making thereof shall be in compliance with the applicable provisions of Section 2 of this Agreement.
. . .
(c) <u>Drawdown Frequency</u>.  Except for Loans made pursuant to Section 3 with respect to Reimbursement Obligations, Loans made pursuant to this Section shall be made no more frequently than once every calendar month unless the Administrative Agent otherwise consents in its sole discretion.

(Freeman Aff. ¶ 23; CA § 5.2 p. 84)

21.     The only "applicable provisions of Section 2" of the Credit Agreement that are relevant here are those set forth in Section 2.1(c), regarding the making of Revolving Loans. (Freeman Aff. ¶ 24)

22.    Section 2.1(c) also includes the provision at issue on this motion:  "(iii) unless the Total Delay Draw Term Commitments have been fully drawn, the aggregate outstanding principal amount of all Revolving Loans and Swing Line Loans shall not exceed $150,000,000."[7]  (Freeman Aff. ¶ 25; CA § 2.1 (c))

23.    Once loan proceeds are funded into the Bank Proceeds Account in response to a Notice of Borrowing, their disbursement is subject to the terms of the Disbursement Agreement. (Freeman Aff. ¶ 26; DA pp. 1-2; Compl. ¶ 39)

24.    Under the Disbursement Agreement, Fontainebleau must submit an advance request ("Advance Request"), typically monthly, to secure disbursements from the Bank Proceeds Account that it can then use to pay the costs of the Project.  (Freeman Aff. ¶ 27; DA §§ 2.1, 2.4)

25.    Under both the Credit Agreement and the Disbursement Agreement, the agreements and the rights and obligations of the parties are governed by, and construed and interpreted in accordance with, New York Law.  (Freeman Aff. ¶ 28; CA § 10.11; DA § 11.6)

**D.    Fontainebleau Submits The March 2 Notice**

26.    On March 2, 2009, Fontainebleau submitted the March 2 Notice to Bank of America, as Administrative Agent, thereby drawing all of the funds remaining in the senior credit facilities -- comprising $350 million under the Delay Draw Term Loan and $670 million under the Revolving Loan.  (The difference between the $800 million Revolving Loan commitment and the $670 million that was drawn consisted of approximately $68 million in

---

[7] Swing Line Loans are not at issue in this case.

outstanding revolving loans that had previously been drawn and was to be repaid out of the $350 million term loan borrowing, as well as $62 million in revolving loans that under the applicable documentation were not to be drawn until final completion of the Project.)  (Freeman Aff. ¶ 29; Freeman Aff. Ex. C; Compl. ¶ 41)

27.    The March 2 Notice specified that the "Borrowing Date" was March 3, 2009.  The Banks were required to fund under the March 2 Notice on the Borrowing Date (March 3). (Freeman Aff. ¶ 30; CA § 2.4(b); Freeman Aff. Ex. C)

28.    On March 3, 2009, Bank of America notified Fontainebleau by letter that it had advised the Lenders (defined to include the Revolver Banks, *see* CA p.1, § 1.1 pp. 24-25) that it would not be processing the March 2 Notice.  The letter asserted that the March 2 Notice "does not comply with the provisions of Section 2.1(c)(iii) of the Credit Agreement."  (Freeman Aff. ¶ 31; Freeman Aff. Ex D; Compl. ¶ 42)

29.    Bank of America thus took the position that Section 2.1(c)(iii) of the Credit Agreement could only be satisfied by *first* drawing the last of the Delay Draw Term Commitments and having those term loans be funded, and only *subsequently*, in a separate Notice of Borrowing, borrowing Revolver Loans in excess of $150 million.  (Freeman Aff. ¶ 32; Freeman Aff. Ex. D; Compl. ¶ 42)

30.    On March 3, 2009, Fontainebleau advised Bank of America by letter that the March 2 Bank Letter was in error and urged Bank of America to reconsider its position (the "March 3 Letter").  (Freeman Aff. ¶ 33; Freeman Aff. Ex. E p. 1; Compl. ¶ 43)

31.    Fontainebleau's March 3 Letter stated in part that Section 2.1(c)(iii) of the Credit Agreement only limits the amount of the Revolving Loan that can be outstanding "unless" the Term Loan has been "fully drawn"; it does not prohibit a Notice of Borrowing that -- like the

13

March 2 Notice -- has in fact upon being submitted "fully drawn" the Term Loan, such that the Notice, when honored the following day on the Borrowing Date, may result in more than $150,000,000 in Revolving Loans outstanding.  (Freeman Aff. ¶ 34; Freeman Aff. Ex. E pp. 1-2; Compl. ¶ 43)

32.    Fontainebleau's March 3 Letter also noted that by fully drawing the Term Loan, the March 2 Notice itself had "fully drawn" the Term Loan and thus removed the limitation on the amount of the Revolving Loan that may be outstanding.  (Freeman Aff. ¶ 35; Freeman Aff. Ex. E p. 2; Compl. ¶ 43)

33.    Fontainebleau also submitted an amended Notice of Borrowing to Bank of America on March 3, correcting a scrivener's error and clarifying that the amount sought under the Revolving Loan was actually $656,522,698.  (The difference between this figure and the original $670 million consists of letters of credit that previously had been issued by the Revolver Banks.)  (Freeman Aff. ¶ 36; Freeman Aff. Ex. E p. 1 fn 1; Freeman Aff. Ex. F; Compl. ¶ 43)

34.    Prior to submitting the March 2 Notice, Fontainebleau had fully performed all of its own obligations under the Credit Agreement.  (Freeman Aff. ¶ 37; Compl. ¶  75)

**E.    The Revolver Banks Breach Their Obligations**

35.    Further correspondence ensued regarding the March 2 Notice of Borrowing, yet Bank of America did not change its position.  (Freeman Aff. ¶ 38; Compl. ¶¶ 44-46)

36.    The Revolver Banks never honored the March 2 Notice.  (Freeman Aff. ¶ 39; Compl. ¶¶ 44-46)

37.    Section 1.1 of the Credit Agreement defines a "Lender Default" as "the failure or refusal (which has not been retracted in writing) of a Lender to make available (i) its portion of any Loan required to be made by such Lender hereunder…."  (Freeman Aff. ¶ 40; CA § 1.1 p. 25)

38.     The Revolver Banks are in Default under the terms of the Credit Agreement. (Freeman Aff. ¶ 41; Compl. ¶¶ 47-48)

39.     Fontainebleau submitted a Notice of Borrowing on March 9, 2009 (the "March 9 Notice"), drawing only the $350 million remaining under the Term Loan but otherwise identical to the March 2 Notice in all respects.  The March 9 Notice specifically reserved its right to contest the Administrative Agent's decision to deny, and the Revolver Banks' refusal to provide, funding under the Revolving Loan.  (Freeman Aff. ¶ 42; Freeman Aff. Ex. G p. 2; Compl. ¶ 46)

40.     On March 10, 2009, Bank of America as Administrative Agent remitted all but approximately $23.3 million of the $350 million in Delay Draw Term Loans to the Bank Proceeds Account.[8]   (Freeman Aff. ¶ 43; Compl. ¶ 46)

## ARGUMENT

### I.     Partial Summary Judgment Is Appropriate At This Time.

Under Federal Rule 56, made applicable by Bankruptcy Rule 7056, summary judgment is proper on "all or any part" of a claim where there exists "no genuine issue as to any material fact" and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Progress Rail Servs. Corp. v. Hillsborough Reg'l Transit Auth.*, No. 8:04-CV-200-T-23EAJ, 2005 U.S. Dist. LEXIS 37729, at *7 (M.D. Fla. Apr. 12, 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).  "An issue is only 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Tomasini v. Mount Sinai Med. Ctr. of Fla., Inc.*, 315 F. Supp. 2d 1252, 1256 (S.D.

---

[8]     The $23.3 million shortfall consisted of defaults from two term lenders -- one of which subsequently funded its share -- and a commitment from First National Bank of Nevada, which is in FDIC receivership.

Fla. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)). "An issue is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the non-moving party." *Id.* (citing *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Matsushita Elec. Ind. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986).

What facts are "material" is determined by reference to the applicable substantive law. *See Rosy Blue, N.V. v. Davis*, No. 6:07-cv-465-Orl-31GKJ, 2008 U.S. Dist. LEXIS 42637, at *5 (M.D. Fla. May 29, 2008) (granting partial summary judgment on claim for breach of contract); *Anderson*, 477 U.S. at 248. Unless there is a genuine dispute as to facts that are outcome-determinative under that law, summary judgment is appropriate. *United Food Mart v. Motiva Enters., LLC*, 457 F. Supp. 2d 1329, 1334 (S.D. Fla. 2005) (citing *Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.")).

Here, the applicable "substantive law" -- New York contract law -- routinely recognizes that where a contract is unambiguous, facts extrinsic to the contract are not material. Disputes as to the breach of an unambiguous contract are properly resolved by summary judgment. *See*, *e.g.*, *White v. Continental Cas. Co.*, 878 N.E.2d 1019, 1021 (N.Y. 2007) (affirming summary judgment: "unambiguous provisions of an insurance contract must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court" (internal citation omitted)); *Zurich Am. Ins. Co. v. ABM Indus.*, 397 F.3d 158, 164 (2d Cir. 2005) ("a court may construe the contract and grant summary judgment when the contractual language is 'plain and unambiguous.'"); *Nature's Best Group, Inc. v. CPC International, Inc.*, 703

N.Y.S.2d 756, 757 (N.Y. App. Div. 2d Dep't  2000) (affirming grant of partial summary

judgment where "the terms of the parties' contracts were clear and unambiguous"); *American*

*Express Bank, Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613, 614 (N.Y. App. Div. 1st Dep't 1990)

("Where the intent of the parties can be determined from the face of the agreement, interpretation

is a matter of law and the case is ripe for summary judgment.").

  Florida law similarly recognizes that "'when the language of a contract is clear and

unambiguous, its interpretation or construction is a matter of law.'"  *CC-Aventura, Inc. v. Weitz*

*Co., LLC*, No. 06-21598-CIV-HUCK/O'SULLIVAN, 2009 U.S. Dist. LEXIS 10119, at *15

(S.D. Fla. Jan. 30, 2009) (citation omitted).  *See also., Bradley v. Sanchez*, 943 So. 2d 218, 221-

222 (Fla. Dist. Ct. App. 3d Dist. 2006) ("'[W]here the determination of the issues of a lawsuit

depends upon the construction of a written instrument and the legal effect to be drawn therefrom,

the question at issue is essentially one of law only and determinable by entry of summary

judgment.'") (citation omitted); *Harbour Square Dev. Corp. v. Miller*, 517 So. 2d 773, 774 (Fla.

Dist. Ct. App. 2d Dist. 1988) ("Where the determination of the rights of the parties in a contract

dispute depends upon the legal effect of clear and unambiguous terms of the contract, the

question at issue is one of law and properly the subject of a summary judgment.") (citation

omitted).[9]

  The fact that discovery has not begun is of no moment.  The Federal Rules specifically

permit motions for summary judgment "at any time" after 20 days have passed from

---

[9] *See, e.g., Burger King Corp. v. Ashland Equities, Inc*., 217 F. Supp. 2d 1266, 1274 (S.D. Fla. 2002)
(granting summary judgment on breach of contract claim regarding an unambiguous contract); *Vencor Hosps. South,
Inc. v. Blue Cross & Blue Shield*, 86 F. Supp. 2d 1155, 1160 (S.D. Fla. 2000) (rejecting parol evidence to interpret
an unambiguous contract and granting summary judgment).

commencement of the action, *see* Fed. R. Civ. P. 56(a), without regard for whether discovery has even commenced. (As discussed below, *see* Point IV, Fontainebleau requests that this Court shorten that time period here.) And in any event, there is no need for discovery because the interpretation of an unambiguous contract is a question of law to be resolved without resort to extrinsic evidence. *See Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1219 (11th Cir. 2000) (District Court has discretion to rule on a motion for summary judgment before the completion of discovery); *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290 n.2 (11th Cir. Fla. 2001) (holding the district court did not abuse its discretion when it granted summary judgment on a breach of contract claim despite the existence of a discovery dispute, in part because "the discovery requested by Appellants was unlikely to produce a genuine issue of material fact."); *Progress Rail Servs. Corp.*, 2005 U.S. Dist. LEXIS 37729 at *27-29 (granting summary judgment on defendant's counterclaim prior to the completion of discovery where the agreements in question were unambiguous and the court could not consider extrinsic evidence); *Citizens for a Better St. Clair County v. James*, 648 F.2d 246, 251-2 (5th Cir. 1981) (holding summary judgment was appropriate prior to discovery when discovery was unnecessary because the issue presented was a question of law). *See also XL Specialty Ins. Co. v. Agoglia*, 2009, Nos. 08-CV-3821, 08-CV-4196, 08-CV-5252, U.S. Dist. LEXIS 36601, at *17 (S.D.N.Y. Mar. 2, 2009) ("where it is clear that the nonmoving party cannot defeat the motion by showing facts sufficient to require a trial for resolution, summary judgment may be granted notwithstanding the absence of discovery") (citation omitted).

In fact, no discovery is required. Fontainebleau's motion for partial summary judgment is based solely on the unambiguous terms of the Credit Agreement and uncontested documentary

evidence, namely the March 2 Notice.  Because the proper interpretation of the Credit

Agreement is a question of law, not fact, summary judgment is appropriate.[10]

## II.    The Revolver Banks Have Breached The Credit Agreement.

The elements of a claim for breach of contract under New York law are "(1) formation of

a contract between plaintiff and defendant; (2) performance by plaintiff; (3) defendant's failure

to perform; and (4) resulting damage."  *Hecht v. Components Int'l, Inc.*, 867 N.Y.S.2d 889, 895

(N.Y. Sup. Ct. 2008); *see, e.g., Furia v. Furia*, 498 N.Y.S.2d 12, 13 (N.Y. App. Div. 2d Dep't

1986).

Fontainebleau has established each of these elements.  It is undisputed that the Credit

Agreement is a valid and enforceable contract.  And Fontainebleau had fully performed its

obligations at all points prior to the March 2 Notice.  Furthermore, the Banks' failure to honor

the March 2 Notice gravely damaged Fontainebleau and its Project by depriving them of

hundreds of millions of dollars in loan proceeds to which Fontainebleau was entitled.  Thus, the

*only* issue that is contested on this motion is the Banks' breach, *i.e.*, whether they improperly

refused to honor the March 2 Notice.  Even on this point, the Banks apparently do not dispute

that the March 2 Notice complied with all applicable conditions under the Credit Agreement,

save for Section 2.1(c)(iii) -- a fact that is confirmed by Bank of America's decision to honor the

subsequent March 9 Notice for the remaining Delay Draw Term Loan funds.  The only

difference between the March 2 Notice and the March 9 Notice was the treatment of the

---

[10]    Federal Rule 56(f) provides that a party may seek discovery to oppose a motion for summary judgment.  If
the Banks seek such discovery, Fontainebleau will demonstrate on reply that such discovery is neither required nor
appropriate.

Revolving Loans.  (Freeman Aff. ¶ 42; Freeman Aff. Ex. C; Freeman Aff. Ex. G)  In fact, Bank of America has never offered any basis for its denial of the March 2 Notice other than its purported failure to comply with Section 2.1(c)(iii).  Accordingly, if the March 2 Notice complied with Section 2.1(c)(iii), then the Banks breached the Credit Agreement by improperly refusing to honor that Notice.

### A.    Applicable Principles Of New York Law

New York law, which governs the construction of the Credit Agreement (CA § 10.11), affords unambiguous provisions of a contract their "plain and ordinary meaning."  "'Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms,' without reference to extrinsic materials outside the four corners of the document."  *Goldman v. White Plains Ctr. for Nursing Care, LLC*, 896 N.E.2d 662, 664  (N.Y. 2008) (citation omitted).  *See also Zalitis v. Circus World Toy Stores*, 603 N.Y.S.2d 897, 898 (N.Y. App. Div. 2d Dep't 1993) ("The 'interpretation of an unambiguous contract provision is a function for the court, and matters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument.'") (citations omitted); *W.W.W. Assocs. v. Giancontieri,* 566 N.E.2d 639, 642 (N.Y. 1990) ("It is well settled that 'extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.'") (citation omitted).[11]  Thus, where an agreement is unambiguous, the intent of the parties "must be

---

[11]    *See also Waldman v. Riedinger*, 423 F.3d 145, 149 (2d Cir. 2005) ("'If a contract is unambiguous on its face, the parties' rights under such a contract should be determined solely by the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable.'") (quoting *County of Suffolk v. Alcorn*, 266 F.3d 131, 138 (2d Cir. 2001)); *SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, No. 07-Civ-2700 (GEL), 2009 U.S. Dist. LEXIS 30657, at *45 (S.D.N.Y. Mar. 31,

gleaned from within the four corners of the instrument," using well-established rules of contractual construction. *Rainbow v. Swisher*, 527 N.E.2d 258, 259 (N.Y. 1988).

In determining whether a contract is ambiguous, a court should

> examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought.

*Kass v. Kass*, 696 N.E.2d 174, 180-1 (N.Y. 1998) (quoting *Atwater & Co. v. Panama R.R. Co.*, 159 N.E. 418, 419 (N.Y. 1927)). *See also Ermiger v. Black,* 827 N.Y.S.2d 764, 766 (N.Y. App. Div. 3d Dep't 2007) ("An unambiguous contract will be enforced as written. Courts determine as a matter of law whether a contract is ambiguous by looking at the document itself and the circumstances under which it was executed, and only look to extrinsic evidence if an ambiguity exists.") (citation omitted); *Olson v. Kehoe Component Sales*, 662 N.Y.S.2d 647, 658 (N.Y. App. Div. 4th Dep't 1997) ("Whether an agreement is clear and unambiguous is a question of law to be resolved by the court, based upon a reading of the contract as a whole to determine its purpose and intent").

The fact that parties to a litigation may dispute the interpretation of a contract does not render it ambiguous. *See Goldman v. Metro. Life Ins. Co.,* 841 N.E.2d 742, 746 (N.Y. 2005) (quoting *Bethlehem Steel Co. v. Turner Const. Co*., 141 N.E.2d 590, 593 (N.Y. 1957) ("[m]ere assertion by one that contract language means something to him, where it is otherwise clear,

---

2009) ("Because the meaning of the obligation is clearly spelled out within the four corners of the agreement, parol evidence about the content of the negotiations or what either party subjectively intended to agree to is not admissible."); *S.W. v. New York City Dep't of Educ.*, No. 07-Civ-9812 (JGK), 2009 U.S. Dist. LEXIS 26500, at *19 (S.D.N.Y. Mar. 30, 2009) (The court is "required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning.").

unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact"); *Metropolitan Life Ins. Co. v. RJR Nabisco Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (determining that contractual language "whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation").

**B.      The Unambiguous Terms Of The Credit Agreement
              Required The Banks To Honor The March 2 Notice.**

In this case, there is no ambiguity in Section 2.1(c)(iii) of the Credit Agreement.  It states:

> (iii)      unless the Total Delay Draw Term Commitments have been fully drawn, the aggregate outstanding principal amount of all Revolving Loans and Swing Line Loans shall not exceed $150,000,000.

The "plain and ordinary meaning" of the words used in this provision is that the "outstanding" Revolving Loans (and Swing Line Loans) cannot exceed $150 million "unless" the Delay Draw Term Commitments "have been fully drawn."  (CA § 2.1(c)(iii))  If the term commitments "have been fully drawn," the condition is satisfied.  Here, the March 2 Notice itself satisfied this condition:  by submitting a notice drawing all remaining Delay Draw Term Commitments funds on March 2, those funds "ha[d] been fully drawn" on March 2; Section 2.1(c)(iii) was satisfied; and there was no bar to having Revolving Loans in excess of  $150 million become "outstanding" the next day, when they were due to be funded, on March 3.

The critical distinction employed by Section 2.1(c)(iii) is between a commitment being "fully drawn" and it being "outstanding."  The meaning of these two terms -- "drawn" and "outstanding" -- can be gleaned from their use elsewhere in the Credit Agreement.  New York law recognizes that words used in different parts of the same contract generally have the same meaning.  *See Dore v. LaPierre*, 226 N.Y.S.2d 949, 952 (N.Y. Sup. Ct. 1962) ("A word used by the parties in one sense is to be interpreted as employed in the same sense throughout the writing

in the absence of countervailing reasons.") (citations omitted); *Cohanzick Partners, L.P. v. FTM Media, Inc.*, 120 F. Supp. 2d 352, 359 (S.D.N.Y. 2000) ( "a word used in one portion of a contract is presumed to have the same meaning when it is used in another portion of the contract"); 11 Richard A. Lord, Williston on Contracts § 32:6 (4th ed. 2009) (same).

When considered "in the light of the obligation as a whole," *Kass*, 673 N.Y.S.2d at 357, it is apparent that these terms have distinct uses under the Credit Agreement.  The word "draw" or "drawn," which is not otherwise employed in the context of borrowings under Article 2, refers to the act of *requesting* funding.  Thus, the Credit Agreement refers to a "notice of a drawing" in the context of letters of credit to be issued by the Revolver Banks; the receipt of such a notice of drawing triggers an obligation to make payment under the applicable Letter of Credit. (CA § 3.3)  Similarly, Section 3.1 of the Credit Agreement, titled "The L/C Commitment," obligates the issuing lenders "to honor drawings under the Letters of Credit."

By contrast, a loan commitment only becomes "outstanding" under the Credit Agreement after the lender has already *funded* in response to a Notice of Borrowing.  If a portion of the commitment has not been funded, it is not "outstanding."  Thus, for example, the term "Total Revolving Extensions of Credit" is defined in the Credit Agreement as "at any time, the aggregate amount of the Revolving Extensions of Credit of the Revolving Banks outstanding at such time."  (CA § 1.1 p. 38)  And the term "payment in full" is specifically defined to exclude certain obligations that "are allowed by the terms thereof to remain *outstanding*."  (CA § 1.2(i) (emphasis added))  The Borrower's obligation on the Revolving Termination Date is to repay "all *outstanding* Revolving Loans . . . ."  (CA § 2.2(b) (emphasis added))  And until repayment, the Borrower is obligated to pay interest on "on the unpaid principal amount of the Loans from time to time *outstanding*. . . ."  (CA § 2.7(a) (emphasis added))

The parties to the Credit Agreement thus used the term "drawn" in its customary sense to mean that a demand for payment has been presented -- either under a letter of credit, or, as here, under a loan commitment via a Notice of Borrowing -- and the term "outstanding" to mean that a loan has been funded.  First a commitment is "drawn"; only afterwards, when it is funded, can it become "outstanding."  Accordingly, the phrase "have been fully drawn" in Section 2.1(c)(iii) required only that a Notice of Borrowing have been submitted -- a requirement that was satisfied by the March 2 Notice *on March 2*, thus permitting Revolving Loans exceeding $150 million to become "outstanding," the next day, on March 3.

The Banks' contrary interpretation would require that the Delay Draw Term Commitments actually be "outstanding" -- not just "fully drawn" -- before borrowing more than $150 million in Revolving Loans.  But Section 2.1(c)(iii) does *not* limit borrowings "unless the Total Delay Draw Term Commitments are fully *outstanding*," and the Banks' reading would strip the term "drawn" of its independent meaning.  New York law rejects such an interpretation. *See Rentways, Inc. v. O'Neill Milk & Cream Co.*, 126 N.E.2d 271, 273 (N.Y. 1955) ("That interpretation is favored which will make every part of a contract effective."); *Helmsley-Spear, Inc. v. New York Blood Ctr., Inc.*, 687 N.Y.S.2d 353, 357 (N.Y. App. Div. 1st Dep't 1999) ("Courts should construe a contract so as to give meaning to all of its language and avoid an interpretation that effectively renders meaningless a part of the contract."); *Benvenuto v. Rodriguez*, 108 N.Y.S.2d 410, 412 (N.Y. App. Div. 1951) ("the well-settled rules of construction require the giving of due consideration to all parts of a contract . . . as to give effect and meaning to every word and expression contained in the agreement").

The flaw in the Banks' reading of the Credit Agreement is underscored by the differences between Section 2.1(c)(iii) and a comparable -- though crucially different -- provision:  Section

2.1(b)(ii).  That provision restricts the funding of delay draw term loans "prior to the date upon which the entire amount in the Second Mortgage Proceeds Account is disbursed."  (CA § 2.1 (b)(ii) p. 41)  By specifying that "the *entire* amount" of a specific account must actually be "disbursed" (*i.e.¸* released to another account) "prior to the date" that *other* loans are forthcoming, this provision of the Credit Agreement does what the Banks claim Section 2.1(c)(iii) is intended to do -- restrict the funding of Revolver Loans exceeding $150 million "prior to the date" that "the entire amount" of the delay draw term loans are funded.  But that is *not* what the Credit Agreement says:  Section 2.1(c)(iii) instead uses the term "fully drawn."

The sophisticated parties and experienced counsel that drafted the Credit Agreement could easily have drafted Section 2.1(c)(iii), along the same lines as Section 2.1(b)(ii), to limit Revolving Loans in excess of $150 million "prior to the date upon which the entire amount [of the Delay Draw Term Commitments] is disbursed [to the Bank Proceeds Account]."   That they chose *not* to do so is further proof that this is not what they intended.  *See International Fid. Ins. Co. v. County of Rockland*, 98 F. Supp. 2d 400, 412 (S.D.N.Y. 2000) ("Sophisticated lawyers, such as those drafting standard forms to be used by the construction industry, must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning."); *see also Taracorp, Inc. v. NL Industries, Inc.*, 73 F.3d 738, 744 (7th Cir. 1996) ("we assume that the same words have the same meaning . . . and that the choice of substantially different words to address analogous issues signifies a different approach").

The Banks' approach to Section 2.1(c)(iii) is also at odds with the purpose of the Credit Agreement, which is to ensure a steady flow of lending to facilitate Fontainebleau's ongoing efforts to "develop, construct and operate the Fontainebleau Resort and Casino."  (CA Recital

"A," p.1)  Requiring that the Delay Draw Term Loans be fully outstanding before submitting a notice of borrowing in excess of $150 million in Revolver Loans would, as noted, require the use of two separate notices of borrowing.  But under Section 5.2(c) of the Credit Agreement, Loans can be made only once per calendar month.  (CA § 5.2 (c))  Bank of America's approach would thus create the risk of a funding gap:  if there were not sufficient funds remaining in the Delay Draw Term Loan to meet a given month's obligations, then Fontainebleau would be forced to borrow that sum (and for those funds to become "outstanding"), and then wait until the following month to meet its obligations with Revolving Loans -- even if the result were defaults on payments to its contractors.  That cannot be what the parties intended, or the "sensible meaning of words" called for by New York law.  *Kass*, 696 N.E.2d at 181.

### C.    The Revolver Banks' Failure To Honor The March 2 Notice Breached The Credit Agreement.

The terms of Section 2.1(c)(iii) are straightforward and unambiguous, and there is only one reasonable construction:  Revolving Loans in excess of $150 million are only prohibited if the Delay Draw Term Commitments have not been "fully drawn."  Here, on the Borrowing Date of March 3, the remaining Term Commitments were "fully drawn" *as of March 2*, thus satisfying that condition and removing any bar to Revolving Loans in excess of $150 million becoming outstanding.

Nevertheless, the Revolver Banks failed and refused to make available their respective shares of the Loan amount set forth in the March 2 Notice.  Section 1.1 of the Credit Agreement defines a "Lender Default" as "the failure or refusal (which has not been retracted in writing) of a Lender to make available (i) its portion of any Loan required to be made by such Lender hereunder…"  (CA  §1.1 p. 25)  The Revolver Banks' refusal to honor the March 2 Notice put them in default under the Credit Agreement.

**III.    The Revolver Banks Are Required to Turnover Their *Pro Rata*
Shares Of $656.5 Million As Property Of The Estate**

Section 542(a) of the Code provides, in pertinent part, that "an entity, other than a

custodian, in possession, custody, or control, during the case, of property that the trustee may

use, sell, or lease under section 363 . . . shall deliver to the trustee, and account for, such property

or the value of such property, unless such property is of inconsequential value or benefit to the

estate."  11 U.S.C. § 542(a).  Similarly, this Court has previously held that "actions to recover

monies owed to the bankruptcy estate may be sought by way of turnover pursuant to § 542.

*Goldberg v. Stern (In re Berris)*, No. 08-01580, 2009 Bankr. LEXIS 1056, at *6 (Bankr. S.D.

Fla. 2009) (Cristol, J.).

The Revolver Banks currently possess property of the estate that must be turned over

pursuant to 11 U.S.C. § 542(a).  As set forth in detail above in Point II, it is undisputed that the

Credit Agreement is a valid and enforceable contract.  Fontainebleau has also established that it

fully performed its obligations at all points prior to the March 2 Notice.  After the March 2

Notice had "fully drawn" the delay term loan on March 2, each of the Revolver Banks was

obligated on March 3 to fund its *pro rata* share of the full amount set forth in the March 2

Notice, as amended  -- $656.5 million -- into the Bank Proceeds Account, which is owned by

Fontainebleau, and interest on those funds would have begun to accrue.  (CA §§ 2.1(c)(iii),

2.7(a); DA § 2.2)

In the instant case, as a matter of law, Fontainebleau has met all of the necessary

condition for the $656.5 million to vest as its property.  *See Wood v. Green*, No. 3:07cv95, 2008

U.S. Dist. LEXIS 60265, at *11 (N.D. Fla. 2008) (stating that "amounts owed to a debtor under

pre-petition contracts, for which the debtor has performed the services required to receive

payment pre-petition, are the property of the bankruptcy estate.").  Numerous courts have held

that "[t]here is no doubt that Congress enacting § 542 contemplated a turnover to the estate of properties and monies which were due to the estate without dispute which are fully matured and payable on demand." *In re Palm Beach Heights Development & Sales Corp.*, 52 B.R. 181, 183 (Bankr. S.D. Fla.) (Cristol, J.) (citing *Chick Smith Ford, Inc. v. Ford Motor Credit Co. (In re Chick Smith Ford, Inc.)*, 46 B.R. 515, 518 (Bankr. M.D. Fla. 1985)).  Equally applicable, these courts have stated that the need for turnover is especially important to permit "a Debtor to obtain funds immediately necessary for survival . . . ." *Id.*  That is precisely the situation here. Fontainebleau is accordingly entitled to an order directing the Revolver Banks to turnover their *pro rata* shares of $656.5 million as property of the estate.

**IV.    This Court Should Exercise Its Discretion To Permit Expedited Filing And Consideration Of This Motion.**

The expeditious resolution of Fontainebleau's motion will aid the ultimate disposition of this action.  Given the present state of the credit markets and economic conditions in Las Vegas, a favorable resolution of this litigation is the only means by which to obtain funding to resume construction of the Project.

If the present motion is granted, the value of the estate will be increase by *hundreds of millions of dollars*.  Among other things, this cash ( or cash collateral, as determined by the Court) will be subject to use under Section 363 of the Code, which will assist Fontainebleau in managing its affairs through this bankruptcy.  Importantly, access to these funds under Section 363 would be permissible even if, as the Banks contend, Fontainebleau is presently unable to satisfy the conditions for submitting an Advance Request under the Disbursement Agreement -- a position with which Fontainebleau in any event disagrees, but which may involve disputed questions of fact.  Finally, Fontainebleau believes that the entry of partial summary judgment

declaring the Revolver Banks in breach will also assist the parties to narrow the issues and perhaps reach a consensual resolution of their differences.

Under Bankruptcy Rule 9006(c), this Court unquestionably has the authority, within its discretion for cause shown, to reduce the time "when an act is required or allowed to be done at or within a specified time by these rules." Bankruptcy Rule 7056, by making applicable Federal Rule 56, allows a motion for summary judgment to be filed "at any time after . . . 20 days have passed from commencement of the action . . . ." Fed. R. Civ. P. 56(a). This Court should reduce that time period to permit the present motion to be filed immediately. *See*, *e.g.*, *In re Kings Falls Power Corp.*, 185 B.R. 431, 440 (Bankr. N.D.N.Y. 1995) (exercising discretion under Bankruptcy Rule 9006 to consider plaintiffs' motion for summary judgment in less than 20 days).

The Advisory Committee Note to Rule 56 explains that the purpose of the 20-day period is to "give[] the defendant an opportunity to secure counsel and determine a course of action." Fed. R. Civ. P. Advisory Committee Note. These goals have already been met. As discussed above, Fontainebleau commenced a substantially similar action in Nevada state court on April 23, 2009. Each of the defendants has already retained counsel, and all but one of the defendants subsequently "determine[d] a course of action" by removing the Nevada case to federal court. Under the circumstances, there is no need for any further delay. *See In re Kings Falls Power Corp.*, 185 B.R. at 441 ("[defendant] has had both an opportunity to secure counsel and determine a course of action").

Accordingly, Fontainebleau respectfully requests that this Court (a) permit the filing of this motion immediately, and (b) schedule a case management conference on notice to the

defendants at the Court's earliest convenience to establish an expedited briefing schedule for this motion.

## CONCLUSION

For the foregoing reasons, Fontainebleau respectfully requests that this Court enter an order (a) granting Fontainebleau's motion for partial summary judgment as to liability on its First Claim for Relief and enter an order declaring that the Revolver Banks breached the Credit Agreement by refusing to honor the March 2 Notice of Borrowing; (b) on Fontainebleau's Seventh Claim for Relief, ordering each of the Revolver Banks to turn over its *pro rata* share of $656.5 million to the bankruptcy estate pursuant to 11 U.S.C. § 542; and (c) directing that the present motion be filed immediately and be briefed, argued, and decided on an expedited schedule.

Dated:   Miami, Florida
              June 10, 2009

**I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court as set forth in Local Rule 2090-1(A).**

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
*Proposed Counsel to the Debtor*
200 South Biscayne Blvd., Suite 2500
Miami, Florida 33131
Telephone: (305) 374-7580
Facsimile:  (305) 374-7593

By:  /s/ Scott L. Baena                             
       Scott L. Baena
       Florida Bar No. 186445
       Mindy A. Mora
       Florida Bar No. 678910
       Jay M. Sakalo
       Florida Bar No. 156310

       and

30

**KASOWITZ, BENSON, TORRES & FRIEDMAN LLP**
*Proposed Litigation Counsel to the Debtor*
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile:  (212) 506-1800
Marc E. Kasowitz
N.Y. Bar No. 1309871
*(pro hac vice pending)*
David M. Friedman
N.Y. Bar No. 2275758
*(pro hac vice pending)*
Jed I. Bergman
N.Y. Bar No. 2928349
*(pro hac vice pending)*

31