UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re:

FONTAINEBLEAU LAS VEGAS HOLDINGS, LLC, *et al.*,

               Debtors.

_____/

FONTAINEBLEAU LAS VEGAS LLC,

               Plaintiff,

v.

BANK OF AMERICA, N.A., *et al.*,

               Defendants.

_____/

Case No. 09-21481-BKC-AJC

Chapter 11

(Jointly Administered)

Adv. Pro. No. 09-01621-ap-AJC

**MOTION TO WITHDRAW THE REFERENCE**

      Defendants Bank of America, N.A., Merrill Lynch Capital Corporation, JPMorgan Chase Bank, N.A., Barclays Bank PLC, Deutsche Bank Trust Company Americas, The Royal Bank of Scotland plc, Sumitomo Mitsui Banking Corporation, Bank of Scotland plc, and HSH Nordbank AG, New York Branch, (collectively, "Defendants" or "Lenders") by and through their undersigned counsel and pursuant to 28 U.S.C. § 157(d), Rule 5011(a) of the Federal Rules of Bankruptcy Procedure, Local District General Rule 87.3 of the Local Rules for the United States District Court for the Southern District of Florida and Rule 5011-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of Florida, hereby move for the entry of an order withdrawing the reference of the above-captioned Adversary Proceeding (the "Adversary Proceeding") filed by Plaintiff Fontainebleau Las Vegas LLC (the "Plaintiff" or

1

"Fontainebleau") to the United States Bankruptcy Court for the Southern District of Florida.

## PRELIMINARY STATEMENT

This Adversary Proceeding is a quintessentially non-core matter involving a dispute governed by state law arising out of an alleged breach of contract that arose pre-petition and which was the subject of a virtually identical state court action that Fontainebleau commenced some six weeks before it commenced its Chapter 11 case. Specifically, the Adversary Proceeding concerns the rights and obligations of Fontainebleau and the Lenders under a Credit Agreement and Disbursement Agreement, both dated as of June 6, 2007 and both of which, by their terms, are governed by New York law (respectively, the "Credit Agreement" and "Disbursement Agreement" and collectively, the "Credit and Disbursement Agreements" or "Agreements").[1] In early March 2009, some three months before there was any bankruptcy case pertaining to the Plaintiff, Fontainebleau took the position that Lenders had breached the Credit Agreement. On April 23, 2009, Fontainebleau commenced a lawsuit in state court in Nevada against the Lenders, which it amended on May 12 (the "Nevada Action").[2] Fontainebleau's amended pleading in the Nevada Action is virtually identical to the Adversary Proceeding complaint that Fontainebleau filed in this Court on June 9, contemporaneously with its Chapter 11 filing. In fact, Fontainebleau elected to voluntarily dismiss the Nevada Action and to refile it as the Adversary Proceeding.

There is no question that this Adversary Proceeding is a non-core matter governed

---

[1]    "This case arises from the breach . . . [of an] unequivocal written promise to Fontainebleau to finance the construction of its multi-billion-dollar casino-resort development project in Las Vegas (the 'Project') . . . ." *See* Amended Complaint, *Fontainebleau Las Vegas, LLC v. Bank of America, et al.*, Adv. Pro. No. 09-01621-ap-AJC (June 10, 2009) ("Am. Compl.") at ¶ 1.

[2]    On May 13, 2009, the Banks removed the Nevada Action to federal court on the basis of Edge Act jurisdiction, 12 U.S.C. § 632, which invests in the federal courts original subject matter jurisdiction over cases in which one or more parties is a national association and which arise out of foreign banking transactions.

by state law that does not involve any substantive rights under Chapter 11 and which not only could have, but did, arise outside the context of a bankruptcy.  This is further confirmed by the fact that a separate action against the Defendants herein was commenced and is pending in Nevada federal court by a group of "term lenders" that are parties to the Credit and Disbursement Agreements (the "Term Lender Action"), which action involves many of the same state law issues presented here, including, *inter alia*, (i) did the Lenders have an obligation to fund in response to a March 3 notice of borrowing that, on its face, did not comply with the terms of the Credit Agreement; (ii) were there Events of Default, within the meaning of the Agreements, that had occurred as of March 3 and which would have enabled the Lenders to terminate their funding commitments had Fontainebleau provided notice thereof, as Fontainebleau was required to do under the Agreements; and (iii) did the Lenders comply with the terms of the Agreements when on April 20, 2009 they terminated their respective funding commitments, after Fontainebleau admitted its inability to comply with its covenants, representations and warranties under the Agreements.  These and other overlapping issues between this case and the Term Lender Action involve questions of state law that could have been, were and, indeed still are, the subject matter of a non-bankruptcy lawsuit that is in no way dependent upon this bankruptcy case and does not arise in or under the Bankruptcy Code.

Fontainebleau's attempt to convert its action into a core proceeding by appending a "turnover" claim is unavailing.  The purported turnover claim adds no new theories of entitlement or damages; rather it simply reiterates the basis for its alleged breach of contract claims.  These contract claims are not payable on demand and are vigorously disputed, and are thus inappropriate for turnover.  Further, even if payable, such turned over funds would still not be available to Fontainebleau unless it were able to satisfy numerous conditions under the

Disbursement Agreement, which it clearly is not.

In light of the manifestly non-core nature of this proceeding and the pendency of the Term Lender Action, substantial cause exists to withdraw the reference so that the Adversary Proceeding can be adjudicated in district court.  Since the Bankruptcy Court does not have jurisdiction to issue final orders and judgments in this non-core matter, *see* 28 U.S.C. § 157 (c)(1), having the case proceed first in Bankruptcy Court will add an unnecessary layer of proceedings that will result in proposed findings and conclusions that will need to be reviewed *de novo* by the district court.  Furthermore, withdrawal of the reference will allow this action to be consolidated and/or coordinated with the Term Lender Action.  This action and the Term Lender Action will involve very similar discovery, including depositions of many of the same witnesses.  Withdrawal of the reference will avoid duplicative litigation and will reduce the chance of inconsistent or conflicting rulings on the many issues that are common to both cases. Thus, considerations of judicial economy, conservation of the parties' resources, consistency of verdicts, and complete resolution of the disputes between the parties all weigh in favor of withdrawing the reference so that the Adversary Proceeding can be adjudicated by the United States District Court for the Southern District of Florida (the "District Court").

## BACKGROUND

### A.    The Parties Enter Into The Credit Agreement

Fontainebleau, certain of its affiliates, the Lenders, and certain other lenders are parties to the June 6, 2007 Credit Agreement and Disbursement Agreement.  Fontainebleau proposed to develop, construct and operate a 63-story, 3,800-room luxury hotel and casino project, including 1,018 condominium-hotel units, located at the north end of the "Strip" in Las Vegas (the "Project").  (Am. Compl. at ¶ 27.)

In connection with this project, Fontainebleau obtained, subject to the terms and conditions of the Credit Agreement and Disbursement Agreement and other related agreements and loan documents, commitments from lenders for a total of $1.85 billion in financing consisting of a $700 million initial term loan facility (the "Initial Term Loan Facility"), a $350 million Delay Draw Term Loan facility (the "Delay Draw Term Loan Facility") and an $800 million revolving credit facility (the "Revolving Credit Facility" or "Revolving Loan") provided by the Lenders.[3]  (Am. Compl. at ¶ 30.)

Fontainebleau's borrowings under the Credit Agreement and Disbursement Agreement involved a two-step procedure in which Fontainebleau would submit a "Notice of Borrowing" for funds that initially would go into a collateral account.  Upon a separate submission of an "Advance Request" such funds were released to the Project as were permitted pursuant to the terms and conditions of the June 6, 2007 Disbursement Agreement among, *inter alia,* the Borrower, other Project Entities (as defined in the Disbursement Agreement), the Lenders, and certain other parties.  (Am. Compl. at ¶¶ 31, 33.)

In order to request loans under the Credit Agreement, Fontainebleau had to satisfy the conditions of the Credit Agreement, including Section 2.1.  (Credit Agmt., §§ 2.1, 5.2, annexed as Freeman Aff. Ex. A.)  Under the terms of the Disbursement Agreement, Fontainebleau had to demonstrate satisfaction of a number of additional conditions, including satisfaction of an "in-balance test" showing sufficient financing for completion of the Project; accrued and payable expenses supporting the transfer of the proceeds and their subsequent proper use; satisfactory progress toward completion; and a bring-down of representations and

---

[3]    One revolver lender, Camulos Master Fund LP, was originally a defendant in the Nevada Action, but is no longer named by Fontainebleau as a party.

warranties, including a "no Material Adverse Change" representation and a solvency representation.  (Disbursement Agmt., § 3.3, annexed as Freeman Aff. Ex. A.)

### B.    Fontainebleau's March Request For A Revolving Loan Is Denied

The Credit and Disbursement Agreements were structured to provide Fontainebleau with periodic funding for completion of the Project as costs were incurred.  Prior to March 2009, Fontainebleau had only requested, and received, approximately $68 million under the Revolving Credit Facility,[4] and Fontainebleau had not borrowed at all under the Delay Draw Term Loan Facility.  (Am. Compl. at ¶ 41.)

On March 2, 2009, Fontainebleau submitted a Notice of Borrowing that sought to borrow the entirety of the Delay Draw Term Loan Facility and most of the Revolving Credit Facility.  More specifically, the Notice of Borrowing requested $350 million under the Delay Draw funds and $670 million under the Revolving Credit Facility.  (Am. Compl. at ¶ 41.)  On March 3, on the basis of an asserted "scrivener's error," Fontainebleau submitted an amended Notice of Borrowing seeking $656.52 million under the Revolving Credit Facility.  (Am. Compl. at ¶ 43.)

Fontainebleau's extraordinary request to borrow more than $1 billion in one fell swoop was not accompanied by any explanation as to why Fontainebleau needed to borrow all of these funds in March.[5]  The request came, moreover, at the same time as the Lenders' construction consultant was raising concerns regarding, among other things, whether

---

[4]    Fontainebleau had also requested and received "letters of credit in the aggregate face amount of approximately $13 million" under the Revolving Credit Facility.  (Karawan Aff. at ¶ 13.)  Under Section 2.1(c) (1) of the Credit Agreement, the availability for funding of the Revolving Credit Facility was reduced by this amount of outstanding letter of credit obligations.  (Credit Agmt., § 2.1.)

[5]    The financing costs of borrowing all of these funds at once was clearly greater for Fontainebleau than if it had just borrowed what it needed to cover current costs and continued to borrow additional funds as the need arose.  Section 2.4(e) of the Credit Agreement requires Fontainebleau to pay interest on funds deposited in the collateral account that have not been disbursed pursuant to the Disbursement Agreement.  (Credit Agmt., § 2.14.)

Fontainebleau's cost reports fully incorporated the actual and expected costs of the project.  The Lenders themselves had requested but been denied the opportunity to meet with Fontainebleau and discuss the status and prospects for the Project.  (Ltr. from H. Yu (Bank of America) to J. Freeman (Fontainebleau), dated Mar. 4, 2009, a true and correct copy of which is annexed hereto as Ex. A; Ltr. from H. Yu to J. Freeman, dated Mar. 10, 2009, a true and correct copy of which is annexed hereto as Ex. B.)

The March Notice of Borrowing for the Revolving Loans did not comply with the provisions of the Credit Agreement.   Among other things, Section 2.1(c) of the Credit Agreement states that "unless the Total Delay Draw Commitments have been fully drawn, the aggregate outstanding principal amount of all Revolving Loans and Swing Line Loans shall not exceed $150,000,000."  (Am. Compl. at ¶¶ 42, 44.)  However, at the time of the March request, the Delay Draw Term Loan Facility was not fully drawn.  Fontainebleau disputed the Bank's interpretation of the Credit Agreement,[6] but subsequently submitted a further amended Notice of Borrowing seeking only the $350 million under the Delay Draw Term Loan Facility, which request was granted.  (Am. Compl. at ¶ 46.)

As noted above, as of the March request, the Lenders had been raising questions with Fontainebleau regarding the progress of the Project and sought further information from Fontainebleau.   (Am. Compl. at ¶ 49.)   Fontainebleau eventually held a meeting with representatives of the Lenders on March 20, 2009.  (Am. Compl. at ¶ 50.)  However, Fontainebleau did not reveal to the Lenders a number of substantial problems which Fontainebleau was experiencing and which came to light in April.

---

[6]      As the Lenders will show at the appropriate time, Fontainebleau's interpretation of the contract is at odds with the express language of the Credit Agreement, with the parties' clearly expressed intention as to how the Credit Agreement would operate and with Fontainebleau's own conduct and statements in the performance of the Credit and Disbursement Agreements.

On March 25, 2009, Fontainebleau finalized the documentation in support of its Advance Request for the month of March. (Am. Compl. at ¶ 51.) Under the terms of the Disbursement Agreement, this meant that Fontainebleau represented, among other things, satisfaction of the "in-balance test," that there had been no material adverse change since closing of the Credit Agreement and that Fontainebleau was solvent as of that date. (Disbursement Agmt., § 3.3.)

Just two weeks later, however, on April 13, 2009, Fontainebleau informed the Lenders that it was no longer able to satisfy the "in-balance test" as is required under the Disbursement Agreement for the release of funds in the collateral account to pay the costs of the Project, because its remaining costs for the Project exceeded its available funds. (Am. Compl. at ¶¶ 52-53.) Indeed, in a document provided the next day, Fontainebleau admitted that it expected nearly $187 million in cost overruns, an amount that exceeded by more than ten times the $14 million in-balance cushion it suggested it had at the end of March. (Fontainebleau Anticipated Costs as of Apr. 14, 2009, a true and correct copy of which is annexed hereto as Ex. C.)

On April 16, 2009, Fontainebleau issued a notice to the Indenture Trustee for bonds that it had outstanding that Fontainebleau was unable to furnish audited financial statements for the year ended December 31, 2008, within the time required under the Indenture Agreement and claimed that Fontainebleau would "continue to work diligently with [its] certified independent accountants to complete the annual audited financial statements." (Fontainebleau Notice to Indenture Trustee, dated Apr. 16, 2009, a true and correct copy of which is annexed hereto as Ex. D.)

Subsequent events, including facts learned when the Lenders met with Fontainebleau on April 17, have provided ample reason to believe that Fontainebleau had been in

default of the Credit and Disbursement Agreements in and prior to March 2009 and that the contractually-required representations and warranties made by Fontainebleau in connection with its Advance Requests were not accurate.  For example, in connection with February and March Advance Requests, Fontainebleau represented that the in-balance test was satisfied and that it was Solvent, even though less than two months later, Fontainebleau conceded that the Project failed the In-Balance test by almost $200 million.[7]  Fontainebleau also represented in connection with these  Advance Requests that there had been no Material Adverse Change, even though Fontainebleau was "intensely focused" on securing additional funding sources for the Project at least since the September 15, 2008 bankruptcy of Lehman Brothers Holding, Inc., which was the largest participant in the Project's mortgage loan.  (Karawan Aff. at ¶¶ 20, 24.)[8]  The inaccuracy of any of these or the other numerous representations and warranties made by Fontainebleau constitutes an Event of Default.  (Credit Agmt., § 8(b).)

On April 20, 2009, Bank of America (as administrative agent), with the consent and at the request of the Lenders holding more than 50% of the outstanding Revolving Credit Facility, notified Fontainebleau that the Lenders "determined that one or more Events of Default have occurred and are continuing" and that any obligations of Revolving Lenders to fund the Revolving Loan Facility, "are terminated effective immediately."  (Am. Compl. at ¶ 55.)

---

[7]    In the summer of 2008, Fontainebleau contacted a construction management firm to provide cost management and auditing services because the Project was "severely over budget."  According to the management firm, which filed a complaint in Nevada federal district court against Fontainebleau in connection with its alleged unlawful discharge, Fontainebleau projected that at the time it had made $130 million in prior overpayments on the Project.  *See* Complaint and attachments in *CCS Int'l v. Fontainebleau Las Vegas, LLC*, No. 2:09-cv-00853-KJD-PAL (D. Nev. May 12, 2009) at ¶¶ 9-10, a true and correct copy of which is annexed hereto as Ex. E.  By the time Fontainebleau discharged the management firm a few months after its retention in Fall 2008, the firm alleged that it had discovered over $40 million in overpayments and was "well on its way" to uncovering at least $130 million in overpayments.  (Ex. E at ¶ 20.)  According to the management firm, Fontainebleau recognized by the summer of 2008 that it had "significant cost overruns that could potentially jeopardize completion of the Project" and that Fontainebleau did not have "appropriate financing to complete the Project."  (Ex. E at ¶¶ 49-50.)

[8]    Fontainebleau's parent company retained the advisory services of the investment bank Moelis & Company LLC in October 2008, presumably to raise additional funds for the Project as Moelis became "well-acquainted with [Fontainebleau's] operations, debt structure, creditors and business and operations."  (Karawan Aff. at ¶ 157.)

9

On April 21, 2009, Fontainebleau's counsel disputed the propriety of the termination and, simultaneously, submitted a Notice of Borrowing for $710 million in Revolving Loans. As the Revolving Loan commitment had been properly terminated, the new borrowing request was not granted. (Am. Compl. at ¶¶ 56-57.)

C.    **Fontainebleau Files Suit Against The Lenders In Nevada State Court**

On April 23, 2009, Fontainebleau filed a state law complaint in the state District Court for Clark County, Nevada alleging breach of contract and related claims. *See* Complaint, *Fontainebleau Las Vegas, LLC v. Bank of America, et al.*, No. A588636 (Apr. 23, 2009) (annexed as Bergman Aff. Ex. A.) Specifically, Fontainebleau asserted claims in the Nevada Action arising from the alleged breach of the Credit Agreement based on the Lenders' denials of the March and April Notices of Borrowing and for the Lenders' April 20, 2009 termination of funding commitments. This initial complaint contained most of the same allegations and claims that have been asserted in each subsequent complaint filed in connection with this ongoing dispute, including an amended complaint filed in Nevada state court on May 12, 2009. *See* Amended Complaint, *Fontainebleau Las Vegas, LLC v. Bank of America, et al.*, No. A588636 (May 12, 2009), annexed as Bergman Aff. Ex. B. On May 13, 2009, the Defendants removed to Nevada federal court pursuant to Edge Act jurisdiction. *See* Notice of Removal filed by Defendants (May 13, 2009), annexed as Bergman Aff. Ex. C.

During the pendency of the Nevada Action, Fontainebleau did nothing to move the case forward, either on an expedited basis or otherwise. No motions for summary judgment were filed and no requests for expedition were made to either the state or federal court. Indeed, issue was not even joined and Fontainebleau consented to two extensions of time for the Defendants to respond. *See* Plaintiff's Rule 41(a)(1) Notice of Voluntary Dismissal (June 9, 2009), annexed as Bergman Aff. Ex. D.

10

D.      **Term Loan And Delay Draw Lenders File Suit Against The Lenders**

On June 6, 2009, a group comprised of some of the lenders under the Term Loan

Facility and under the Delay Draw Facility filed a complaint in the United States District Court

for the District of Nevada against the Defendants to the Adversary Proceeding.  *See,* Complaint

in *Avenue CLO Fund, Ltd., et al., v. Bank of America, N.A., et al.*, 2:09-cv-01047-KJD-PAL (D.

Nev. June 9, 2009), a true and correct copy of which is annexed hereto as Ex. F.  The Term

Lender Action alleges virtually the same contract breach and equity claims as the Adversary

Complaint based on the Lenders' denials of the March and April Notices of Borrowing and the

Lenders' April 20, 2009 termination of funding commitments.  (Ex. F at ¶¶ 184-191.)  The

complaint in the Term Lender Action also alleges that one or more Events of Default existed as

of March 2009, which would have relieved them of their obligation to fund, had they been aware

of these Events of Default.

Indeed, although Fontainebleau is not named as a party to the Term Lender

Action, the civil cover sheet accompanying the filing identifies the cause of action initiated

prepetition by Fontainebleau as a "related" case.  (Ex. F, Civil Cover Sheet, Attachment 1.)

E.      **Fontainebleau Declares Bankruptcy**

On June 9, 2009, Fontainebleau and certain of its affiliates filed petitions for relief

under Chapter 11 of the Bankruptcy Code.  (Am. Compl. at ¶ 70.)  That same day, Fontainebleau

filed its original complaint in this Adversary Proceeding, which was virtually identical to its

amended complaint in the Nevada Action and, the same day voluntarily dismissed the Nevada

Action.  (Case 09-01621-AJC, Doc 1 ¶¶ 13-14.)  The next day, on June 10, Fontainebleau

submitted the Amended Complaint.  The Amended Complaint did not provide any additional

facts on which the action is based or any additional theories of damages.  The Amended

Complaint merely appended a claim for turnover pursuant to 11 U.S.C. § 542 and added this as a

purported basis for "core" jurisdiction.  (Am. Comp. ¶¶ 14, 131-139.)  As acknowledged by

Fontainebleau, the Amended Complaint is "substantially similar" to Fontainebleau's prepetition

complaint filed in April 2009 in Nevada state court, as amended in May 2009.  (Karawan Aff. at

¶ 147.)  Defendants have yet to be served with the Amended Complaint.

## ARGUMENT

The Lenders respectfully submit that the District Court is the appropriate forum

for litigating the claims and issues presented by the Amended Complaint and, as such, the

reference to the Bankruptcy Court should be withdrawn.  A district court may withdraw the

reference to the bankruptcy court to hear an adversary proceeding "for cause shown."  *See* 28

U.S.C. § 157(d).  Section 157(d) does not define the term "cause," but courts in this Circuit have

examined a number of factors to determine whether withdrawal is appropriate.  In particular,

courts consider whether the claim is core or non-core, *see Control Center, L.L.C. v. Lauer*, 288

B.R. 269, 274 (M.D. Fla. 2002).  A finding that the claim is non-core weighs in favor of

withdrawal.  *See id.*  Courts in this Circuit also consider whether withdrawal would prevent

advancement of uniformity in bankruptcy administration, decrease forum shopping and

confusion, promote economical use of the parties' resources, and facilitate the bankruptcy

process. *See In re Parklane/Atlanta Joint Venture*, 927 F.2d 532, 536 n.5 (11th Cir. 1991).

In the instant matter, it is clear that the claims advanced in the Adversary

Proceeding – all based on an alleged prepetition breach of contract – are independent of and

antecedent to the bankruptcy.  Fontainebleau's claims are quintessentially non-core.  The other

factors that inform the withdrawal analysis, namely judicial economy, full and complete

resolution of claims and the importance of consistent rulings all further weigh in favor of the

withdrawal.  In particular, the pendency of the related Term Lender Action in Nevada federal

court presents a real risk of multiple courts expending resources on claims arising from the same nucleus of operative facts, and the related risk of inconsistent and conflicting results, should the Adversary Proceeding continue in the Bankruptcy Court.  Finally, the Adversary Proceeding would not result in a full and complete resolution of the dispute between the Lenders, Fontainebleau and the Term Lenders in the Term Lender Action because these Term Lenders are not parties to the Adversary Proceeding in Bankruptcy Court.

## I.    This Contract Dispute Is A Non-Core Proceeding

### A.    The Core/Non-Core Distinction

Core proceedings are those either "arising under title 11, or arising in a case under title 11."  28 U.S.C. § 157(b)(1).  A proceeding is "arising under title 11" if it invokes a substantive right provided by title 11.  *In re Toledo*, 170 F.3d 1340, 1349 (11th Cir. 1999).  A proceeding is "arising in a case under title 11" if, by its nature, it could arise only in the context of a bankruptcy case.  *Id*.  Thus, a proceeding is core if it either (i) invokes a substantive right provided by title 11 (*i.e.* "arising under title 11") or (ii) is a proceeding that, by its nature, could arise only in the context of a bankruptcy case (*i.e.* "arising in a case under title 11").  28 U.S.C. § 157(b)(2).

### B.    The Law Is Well Settled:  Prepetition Breach of Contract Claims Are Non-Core

The matter *sub judice* involves the purported prepetition breach of a contract that is governed by New York law.[9]  It raises straightforward state law issues of contract interpretation and enforcement.  The United States Supreme Court has made clear that such proceedings are non-core:

---

[9]    In addition to claims for breach, Fontainebleau alleges several claims in equity and tort.  These latter claims, however, arise from the same nucleus of facts and circumstances as those alleged by Fontainebleau for breach of contract and are all governed by state law.  (Am. Compl. at ¶ 1.)

> [T]he lawsuit in which Marathon was named defendant seeks damages
> for breach of contract, misrepresentation, and other counts which are
> the stuff of the traditional actions at common law tried by the courts at
> Westminster in 1789.  There is apparently no federal rule of decision
> provided for any of the issues in the lawsuit; the claims of Northern
> arise entirely under state law.  No method of adjudication is hinted,
> other than the traditional common-law mode of judge and jury.  The
> lawsuit is before the Bankruptcy Court only because the plaintiff has
> previously filed a petition for reorganization in that court.

*Northern Pipeline Const. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 90 (1982) (Rehnquist, J.

concurring); *see also Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 584 (1985)

(citing *Marathon*, 458 U.S. at 84, 90-92 (Rehnquist, J. concurring)) (stating that *Marathon*

established "that Congress may not vest in a non-Article III court the power to adjudicate, render

final judgment, and issue binding orders in a traditional contract action arising under state law,

without consent of the litigants, and subject only to ordinary appellate review.").  A year later,

the Supreme Court reiterated:  "This Court held [in *Marathon*] that 'Congress may not vest in a

non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a

traditional contract action arising under state law, without consent of the litigants, and subject

only to ordinary appellate review.'"  *CFTC v. Schor*, 478 U.S. 833, 838-39 (1986).

Courts in this Circuit have repeatedly found that actions for prepetition breach of

contract claims and related claims are, by nature, non-core.  For example:

- o *First Florida Bldg. Corp. v. Employers Ins. Of Wausau (In re Shafer & Miller Indus. Inc.)*, 66 B.R. 578, 580 (S.D. Fla. 1986).  In *Shafer*, the district court held that debtors' breach of contract action was a non-core proceeding because a "state created right to recover damages for breach of contract, even though such damages would ultimately enhance the debtor's estate, did not transform what is essentially a private right into a public right … [P]rivate rights must be finally adjudicated by Article III judges."

- o *Marill Alarm Sys. v. Equity Funding Corp. (In re Marill Alarm Sys.)*, 81 B.R. 119, 123 n.8 (S.D. Fla. 1987).  In *Marill Alarm Systems*, the district court observed that "[n]umerous courts have noted the necessity of defining core proceedings narrowly so as to conform with the

constitutional proscription of *Marathon*" and found that despite the fact that the complaint in the adversarial proceeding listed two causes of action that arguably arose under title 11, the essential issue – the propriety of the terms of a loan to the debtor – was non-core.

o  *In re Naturally Beautiful Nails, Inc.*, 252 B.R. 574, 576 (Bankr. M.D. Fla. 2000).  In *Naturally Beautiful Nails*, the Bankruptcy Court recognized that claims for breach of contract, fraud in the inducement, and conversion are "certainly not" core claims.

o  *Control Center*, 288 B.R. at 277.  In the *Control Center* decision, the district court held that actions for breach of contract, defamation and trademark misappropriation were non-core claims, because, *inter alia*, "[h]ad there been no bankruptcy, this action could have proceeded in a state court, and would be virtually identical to this action despite [the debtor's] reorganization."

Determination of the Adversary Proceeding will not involve substantive bankruptcy rights and as such does not arise under Title 11.  Rather, Fontainebleau's claims are predicated on state law theories of breach of contract, tort and equity.  (Am. Compl. at ¶¶ 73-101.)  Nor are the asserted claims either unique to bankruptcy proceedings or uniquely affected by Fontainebleau's bankruptcy case.  Indeed, weeks prior to its bankruptcy petition Fontainebleau filed essentially the same complaint as the Amended Complaint in Nevada state court.

Fontainebleau tries to suggest that the outcome of this Adversary Proceeding will determine whether it will be able to complete the Project and successfully reorganize.  These rhetorical assertions are belied by several indisputable facts.  As Fontainebleau acknowledged back in April, the Revolving Loan proceeds are nowhere near enough to cover the current projected costs needed to complete the Project.  Moreover, even if the Revolving Loan is funded, Fontainebleau could not possibly satisfy the numerous conditions required to withdraw those funds from the Bank Proceeds Account.[10]

---

[10]       Indeed, Fontainebleau did not attempt to make a request to disburse the fund in April 2009 and, to date,

Moreover, even where a pre-petition state law claim could fairly be said to determine a debtor's continued viability, that does not turn a proceeding to press that claim into a core proceeding. As the Second Circuit Court of Appeals has recognized, even if "the outcome [of the adversary proceeding] could determine [the debtor's] continued viability as an enterprise," finding that a proceeding is core merely because it involves property of the estate would "create an exception … that would swallow the rule." *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion)*, 4 F.3d 1095, 1102 (2d Cir. 1993). *See also In re Shafer & Miller Indus., Inc.*, 66 B.R. at 580 ("[A] state-created right to recover damages for breach of contact, even though such damages would ultimately enhance the debtor's estate, [does] not transform what is essentially a private right into a public right."). Any contrary result would eviscerate the principle of core and non-core as almost every proceeding in which a debtor sought relief for an alleged pre-petition breach of contract would have an effect on the estate. *See In re Marill Alarm Sys.*, 81 B.R. at 123 n.8 ("If this Court conferred core jurisdiction on that basis [that the debtor's claim affects the liquidation of the assets of the estate], virtually any claim which could increase the assets in the estate would entitle the bankruptcy court to ignore the constitutional proscription set forth in *Marathon*. This Court will not interpret section 157 so broadly."); s*ee also In re U.S. Brass Corp.*, 110 F.3d 1261, 1268-9 (7th Cir. 1997) ("[Debtor's] claimed right to insurance coverage is a creation of state contract law and one that could be vindicated in an ordinary breach of contract suit if [debtor] were not a bankrupt. The fact that it is an important right to the bankrupt—[debtor] claims to be seeking $500 million in insurance coverage—is irrelevant.").

C.    **Fontainebleau's Attempt To Convert A Non-Core Proceeding Into A Core Proceeding By Appending A Turnover Claim Should Be Rejected**

---

there is approximately $136.5 million in Delay Draw Term Loans still held in the collateral account which has not been advanced to pay the costs of the Project. (Karawan Aff. at ¶ 13 n.7.)

After initially cloning its complaint in the Nevada Action as its Adversary Proceeding complaint, Fontainebleau amended its filing by adding a purported "turnover" claim as an additional cause of action against Defendants. Specifically, Fontainebleau asserts that the amount in controversy of its breach of contract cause of action is actually "property of the estate." (Am. Compl. at ¶¶ 131-139.) Fontainebleau cites to this "turnover" claim as a basis to assert that the Adversary Proceeding is "core." (Am. Compl. at ¶ 14.) Fontainebleau's attempt to disguise this non-core matter as one arising in or under Chapter 11 by tacking on a "turnover" claim is unavailing.

In enacting the turnover provision, Congress intended it "to apply to tangible property and money due to the debtor *without dispute* that are *fully matured* and *payable on demand*." *In re Charter*, 913 F.2d 1575, 1579 (11th Cir. 1990) (emphasis added) (citing *United States v. Whiting Pools, Inc*. 462 U.S. 198, 202-03 (1983)). In doing so, Congress intended to ease reorganization by allowing the debtor to obtain funds that were not in dispute. *See id.* Accordingly, and as courts, including the Court of Appeals for the 11th Circuit, have held, "turnover proceedings are not to be used to liquidate disputed contract claims." *In re Charter*, 913 at 1579; *see also In re Ven-Mar Int'l, Inc*., 166 B.R. 191, 192-93 (Bankr. S.D. Fla. 1994) (noting that, if a purported turnover claim "cannot be properly characterized as a 'turnover action' then this matter is 'non-core' … The mere characterization of an action as one for turnover does not mean that it is a 'turnover action' … [turnover] does not provide trustees and debtors in possession with the ability to recover property where a dispute exists between the parties."); *In re Centennial Coal*, 278 B.R. 54 (Bankr. D. Del. 2002) (holding that the "mislabeling" of a pre-petition contract claim as an action for turnover was insufficient to make a fundamentally non-core proceeding into a core proceeding).

17

But this is exactly the result Fontainebleau now seeks.   In particular, Fontainebleau wants to obtain funds predicated on a state law claim for breach of contract.   The purported turnover claim adds no new theories of entitlement or damages; rather it simply reiterates the disputed claim that the March Notice of Borrowing submitted by Fontainebleau complied with the Credit Agreement and declares in conclusory fashion that the Lenders were obligated to comply with the March request for funding.   Indeed, this very claim was brought almost two months ago in the Nevada Action as a state law breach of contract/declaratory judgment claim.

Moreover, as Fontainebleau concedes in its motion for partial summary judgment, even if the Lenders were found to have an obligation to fund – despite Fontainebleau's non-compliance with the Credit and Disbursement Agreements and despite the clear prohibitions on the enforcement of a financial accommodation in a Chapter 11 case[11] – the proceeds would be placed in a collateral account and would only become available to Fontainebleau upon its satisfaction of numerous conditions.   Fontainebleau itself has acknowledged that its ability to satisfy these conditions, at a minimum, gives rise to disputed issues of fact.   *See* Fontainebleau's Motion for Partial Summary Judgment, 09-01621-AJC, Doc 6 (June 10, 2009) at p. 28.

This Court should not countenance Fontainebleau's attempt to convert what is patently a non-core proceeding into a core proceeding by tacking on a turnover claim.   *See, e.g.,* *In re Charter*, 913 F.2d at 1579 (stating that applying turnover principles to a prepetition contract dispute "would allow [the debtor] to recover monies under the Bankruptcy Code from disputed claims based strictly on state law.   Certainly such procedure would not be sanctioned outside

---

[11]       Section 365(c)(2) provides that a nondebtor may not be required to make new, additional extensions of credit to a debtor that has become insolvent. *See In re Metro Affiliates, Inc.*, Bankruptcy No. 02-42560 (PCB), Ad. No. 03-6364, 2008 Bankr. LEXIS 752, at *17 (Bankr. S.D.N.Y. Mar. 6, 2008) ("[T]he purpose of this subsection was to prevent the trustee, here the debtor in possession, from requiring new advances of money under a pre-petition contract.").

bankruptcy and there is no just reason why it should be sanctioned just because the entity seeking to collect disputed funds happens to be a Debtor under the Bankruptcy Code.") (internal citation omitted).

## II. The Interests Of Judicial Efficiency And Uniformity Of Result, Conservation Of The Parties' Resources Require Withdrawal Of The Reference

The interests of judicial efficiency and uniformity of results and the conservation of the parties' resources weigh decidedly in favor of withdrawal of the reference.

### A. The Fact That The Adversary Proceeding Is A Non-Core Proceeding Weighs Heavily In Favor Of Withdrawal Of Reference

The determination that the Adversary Proceeding is non-core is central to the withdrawal analysis. This is because in a non-core proceeding a bankruptcy court's findings of fact and conclusions of law are subject to *de novo* review by the district court. This results in a litigation "two step," with both the judiciary and the parties having to expend time and resources unnecessarily. This inefficient outcome can be eliminated, though, if the reference is withdrawn and the relevant dispute litigated in front of the district court with its authority to make final findings of fact and conclusions of law. Accordingly, and in the interests of efficiency, a finding that the proceeding is non-core weighs heavily in favor of withdrawal. *See Control Center*, 288 B.R. at 275 ("[A] determination that a proceeding is non-core weighs in favor of transferring the matter to a district court."); *see also Solutia Inc. v. FMC Corp.*, No. 04 Civ. 2842, 2004 WL 1661115, at *2 (S.D.N.Y. 2004) (finding that "judicial economy favors withdrawal of the reference" and that by "litigating this non-core matter in the district court, judicial resources will be conserved instead of having two courts administer two rounds of briefing and argument on the same issues.").

### B. The Pendency Of The Lender Action Favors Withdrawal Of The Reference To Promote Judicial Efficiency And Conserve The Parties' Resources

There is currently pending in the District of Nevada the Term Lender Action, which is based on the same nucleus of operative facts as the Adversary Proceeding; implicates the same issues of law and equity as the Adversary Proceeding; and likely will require substantially the same discovery as the Adversary Proceeding.  If this Court grants the Lenders' request to withdraw the reference, the Lenders intend to move to consolidate and/or coordinate the two matters so that the relevant issues and rights can be adjudicated in one proceeding.  If this Court were to deny the Lenders' request, however, the Lenders and the Court would be faced with two competing but intertwined litigations.  Moreover, litigating on two fronts will result in enormous, unnecessary and duplicative expenditures for the estate which would otherwise be available for the reorganization efforts, particularly in light of the scale of discovery (documentary and testimonial) that the proceedings will entail.  The duplicative litigation would also needlessly expend the resources of the Lenders and the federal judiciary.  Further, since the matter was only recently filed, the Bankruptcy Court's familiarity with the parties and the issues in dispute is not a factor.  Finally, and notwithstanding the time and resources the respective courts and parties will spend, neither of these litigations would result in full and complete disposition as to all interested parties' claims because neither proceeding involves all the interested litigants.

### C.    Withdrawal Of The Reference Will Promote The Interests Of Uniformity

Withdrawal will also ensure uniformity of results.  As described above, the Lenders intend to move promptly to consolidate the Adversary Proceeding with the Term Lender Action pending in the District of Nevada.  Consequently, one court with the one common nucleus of operative facts before it would be able to adjudicate the various parties' competing interests and claims.  Conversely, if this Court were to deny the Lenders' request, the Lenders face an unjustified risk of inconsistent results with respect to two actions which, in terms of

factual and legal issues, are almost identical. *See, e.g., Big Rivers Elec. Corp. v. Green River Coal Co., Inc.*, 182 B.R. 751, 755 (W.D. Ky. 1995) (granting motion to withdraw the reference in a core dispute because of overlapping factual and legal issues between adversary proceeding and parallel civil action in federal district court).

Having the Adversary Proceeding litigated in separate forums could result in inconsistent and conflicting rulings on a number of central issues, including whether the Lenders were obligated to fund in response to the deficient March borrowing notice, whether Events of Default had occurred at the time of the March borrowing notice, and whether the Lenders were entitled to terminate their funding commitments after Fontainebleau admitted it was unable to comply with its covenants, representations and warranties under the Agreements.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the District Court enter an order pursuant to 28 U.S.C. § 157(d); Bankruptcy Rule 5011(a) and Local Rule 5011-1, withdrawing the reference of the Adversary Proceeding to the Bankruptcy Court.

Dated:  June 16, 2009

GREENBERG TRAURIG, LLP

By: /s/ Mark D. Bloom_____
Mark D. Bloom
Florida Bar No. 303836
GREENBERG TRAURIG, P.A.
1221 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
Email: bloomm@gtlaw.com

-and-

SIMPSON THACHER & BARTLETT LLP
Thomas C. Rice (*pro hac vice pending*)
David Woll (*pro hac vice pending*)
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
Email: trice@stblaw.com
        dwoll@stblaw.com

ATTORNEYS FOR DEFENDANTS JPMORGAN
CHASE BANK, N.A., BARCLAYS BANK PLC,
DEUTSCHE BANK TRUST COMPANY
AMERICAS, and THE ROYAL BANK OF
SCOTLAND PLC

Craig V. Rasile
Kevin M. Eckhardt
HUNTON & WILLIAMS LLP
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
Telephone:  (305) 810-2500
Facsimile:  (305) 810-1669
E-Mail:  crasile@hunton.com
          keckhardt@hunton.com

-and-

Bradley J. Butwin (*pro hac vice pending*)
Jonathan Rosenberg (*pro hac vice pending*)
Daniel L. Cantor (*pro hac vice pending*)
William J. Sushon (*pro hac vice pending*)
O'MELVENY & MYERS LLP
Times Square Tower
Seven Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile:  (212) 326-2061
E-mail:  bbutwin@omm.com
          jrosenberg@omm.com
          dcantor@omm.com
          wsushon@omm.com

Attorneys for BANK OF AMERICA, N.A.
and MERRILL LYNCH CAPITAL
CORPORATION

SHUTTS & BOWEN LLP
Robert G. Fracasso
rfracasso@shutts.com
1500 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131
Telephone:  (305) 379-9102
Facsimile:  (305) 347-7802

-and-

MAYER BROWN LLP
Jean-Marie L. Atamian (*pro hac vice pending*)
Jason I. Kirschner (*pro hac vice pending*)
1675 Broadway
New York, New York 10019-5820
Telephone:  (212) 506-2500
Facsimile: (212) 262-1910

ATTORNEYS FOR SUMITOMO
MITSUI BANKING CORPORATION

STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON,
PA
Harold D. Moorefield, Jr.
Drew M. Dillworth
Museum Tower
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-3395

-and-

KATTEN MUCHIN ROSENMAN LLP
Kenneth E. Noble (*pro hac vice pending*)
Anthony L. Paccione (*pro hac vice pending*)
575 Madison Avenue
New York, New York 10022
Telephone: (212) 940-8800
Facsimile: (212) 940-8776

ATTORNEYS FOR DEFENDANT BANK
OF SCOTLAND PLC

RICE PUGATCH ROBINSON &
SCHILLER, P.A.
Arthur Halsey Rice
101 Northeast Third Avenue, Suite 1800
Fort Lauderdale, Florida 33301
Telephone: (954) 462-8000
Facsimile: (954) 462-4300

KAYE SCHOLER LLP
Aaron Rubinstein (*pro hac vice pending*)
Phillip A. Geraci (*pro hac vice pending*)
425 Park Avenue
New York, New York 10022
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

ATTORNEYS FOR DEFENDANT HSH
NORDBANK AG, NEW YORK
BRANCH

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served electronically via the Court's CM/ECF system upon the parties who are currently on the list to receive e-mail notice/service for this case on this 16th day of June, 2009.

Dated: June 16, 2009

By: ____/s/ Mark D. Bloom_____
            Mark D. Bloom