# EXHIBIT

# F

1  **COMP**

2  **HENNIGAN, BENNETT & DORMAN LLP**
   J. Michael Hennigan *(will comply with LR 1A 10-2 within 45 days)*
3  henniган@hbdlawyers.com
   Bruce Bennett *(will comply with LR 1A 10-2 within 45 days)*
4  bennettb@hbdlawyers.com
   Lauren A. Smith *(will comply with LR 1A 10-2 within 45 days)*
5  smithl@hbdlawyers.com
   Michael C. Schneidereit *(will comply with LR 1A 10-2 within 45 days)*
6  schneidereitm@hbdlawyers.com
   865 South Figueroa Street, Suite 2900
7  Los Angeles, California  90017
   Telephone:  (213) 694-1200
8  Fax:  (213) 694-1234

9

10  Attorneys for Plaintiffs

11                 **UNITED STATES DISTRICT COURT**

12                      **DISTRICT OF NEVADA**

13

14  AVENUE CLO FUND, LTD.; AVENUE        )  Case No. _____
15  CLO II, LTD.; AVENUE CLO III, LTD.;  )
    AVENUE CLO IV, LTD.; AVENUE CLO V,   )  **COMPLAINT FOR BREACH OF**
16  LTD.; AVENUE CLO VI, LTD.; BABSON     )  **CONTRACT, BREACH OF THE IMPLIED**
    CLO LTD. 2004-I; BABSON CLO LTD.     )  **COVENANT OF GOOD FAITH AND FAIR**
17  2004-II; BABSON CLO LTD. 2005-I;     )  **DEALING, AND DECLARATORY RELIEF**
    BABSON CLO LTD. 2005-II; BABSON      )
18  CLO LTD. 2005-III; BABSON CLO LTD.   )  **JURY TRIAL DEMANDED**
    2006-I; BABSON CLO LTD. 2006-II;     )
19  BABSON CLO LTD. 2007-I; ARTUS LOAN   )
    FUND 2007-I LTD.; BABSON LOAN        )
20  OPPORTUNITY CLO, LTD.; JFIN CLO      )
    2007 LTD.; SAPPHIRE VALLEY CDO I,    )
21  LTD.; JEFFERIES FINANCE CP FUNDING   )
    LLC; BRIGADE LEVERAGED CAPITAL       )
22  STRUCTURES FUND, LTD.; BATTALION     )
    CLO 2007-1 LTD.; CANYON CAPITAL      )
23  ADVISORS, LLC; CASPIAN CORPORATE     )
    LOAN FUND, LLC; CASPIAN CAPITAL      )
24  PARTNERS, L.P.; CASPIAN SELECT       )

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   CREDIT MASTER FUND, LTD.;                    )
    MARINER OPPORTUNITIES FUND, LP;              )
2   SANDS POINT FUNDING LTD.; COPPER             )
    RIVER CLO LTD.; KENNECOTT                     )
3   FUNDING LTD.; NZC OPPORTUNITIES              )
    (FUNDING) II LIMITED; GREEN LANE             )
4   CLO LTD.; 1888 FUND, LTD.; ORPHEUS            )
    FUNDING LLC; ORPHEUS HOLDINGS                )
5   LLC; LFC2 LOAN FUNDING LLC;                   )
    HALCYON LOAN INVESTORS CLO I                 )
6   LTD.; HALCYON LOAN INVESTORS CLO             )
    II LTD.; HALCYON STRUCTURED ASSET            )
7   MANAGEMENT LONG SECURED/SHORT                )
    UNSECURED CLO 2006-1 LTD.;                    )
8   HALCYON STRUCTURED ASSET                      )
    MANAGEMENT EUROPEAN CLO 2008-II              )
9   B.V.; HALCYON STRUCTURED ASSET               )
    MANAGEMENT CLO I LTD.; HALCYON               )
10  STRUCTURED ASSET MANAGEMENT                  )
    LONG SECURED/SHORT UNSECURED                 )
11  2007-1 LTD.; HALCYON STRUCTURED             )
    ASSET MANAGEMENT LONG                        )
12  SECURED/SHORT UNSECURED 2007-2              )
    LTD.; HALCYON STRUCTURED ASSET              )
13  MANAGEMENT LONG SECURED/SHORT                )
    UNSECURED 2007-3 LTD.; ABERDEEN             )
14  LOAN FUNDING, LTD.; ARMSTRONG                )
    LOAN FUNDING, LTD.; BRENTWOOD                )
15  CLO, LTD.; EASTLAND CLO, LTD.;               )
    EMERALD ORCHARD LIMITED;                     )
16  GLENEAGLES CLO, LTD.; GRAYSON                )
    CLO, LTD.; GREENBRIAR CLO, LTD.;             )
17  HIGHLAND CREDIT OPPORTUNITIES               )
    CDO, LTD.; HIGHLAND LOAN FUNDING             )
18  V, LTD.; HIGHLAND OFFSHORE                    )
    PARTNERS, L.P.; JASPER CLO, LTD.;            )
19  LIBERTY CLO, LTD.; LOAN FUNDING IV           )
    LLC; LOAN FUNDING VII LLC; LOAN              )
20  STAR STATE TRUST; LONGHORN                    )
    CREDIT FUNDING, LLC; RED RIVER               )
21  CLO, LTD.; ROCKWALL CDO LTD.;                )
    ROCKWALL CDO II, LTD.; SOUTHFORK             )
22  CLO, LTD.; STRATFORD CLO, LTD.;              )
    WESTCHESTER CLO, LTD.; ING PRIME            )
23  RATE TRUST; ING SENIOR INCOME                )
    FUND; ING INTERNATIONAL (II) -               )
24  SENIOR BANK LOANS EURO; ING                  )

741299

Case 2:09-cv-01047-KJD-PAL    Document 1    Filed 06/09/2009    Page 3 of 37

1   INTERNATIONAL (II) - SENIOR BANK          )
    LOANS USD; ING INVESTMENT                 )
2   MANAGEMENT CLO I, LTD.; ING               )
    INVESTMENT MANAGEMENT CLO II,             )
3   LTD.; ING INVESTMENT MANAGEMENT           )
    CLO III, LTD.; ING INVESTMENT             )
4   MANAGEMENT CLO IV, LTD.; ING              )
    INVESTMENT MANAGEMENT CLO V,              )
5   LTD.; ENCORE FUND LP; NUVEEN              )
    FLOATING RATE INCOME FUND;                )
6   FORTISSIMO FUND; NUVEEN                   )
    FLOATING RATE INCOME                      )
7   OPPORTUNITY FUND; NUVEEN SENIOR           )
    INCOME FUND; SYMPHONY CREDIT              )
8   OPPORTUNITY FUND, LTD.;                   )
    SYMPHONY CLO I, LTD.; SYMPHONY            )
9   CLO II, LTD.; SYMPHONY CLO III, LTD.;     )
    SYMPHONY CLO IV, LTD.; SYMPHONY           )
10  CLO V, LTD.; CARLYLE HIGH YIELD           )
    PARTNERS 2008-1, LTD.; CARLYLE            )
11  HIGH YIELD PARTNERS V, LTD.;              )
    CARLYLE HIGH YIELD PARTNERS VI,           )
12  LTD.; CARLYLE HIGH YIELD PARTNERS         )
    VII, LTD.; CARLYLE HIGH YIELD             )
13  PARTNERS VIII, LTD.; CARLYLE HIGH         )
    YIELD PARTNERS IX, LTD.; CARLYLE          )
14  LOAN INVESTMENT, LTD.; CENTURION          )
    CDO VI, LTD.; CENTURION CDO VII,          )
15  LTD.; CENTURION CDO 8, LIMITED;           )
    CENTURION CDO 9, LIMITED; CENT            )
16  CDO 10 LIMITED; CENT CDO XI               )
    LIMITED; CENT CDO 12 LIMITED; CENT        )
17  CDO 14 LIMITED; CENT CDO 15               )
    LIMITED; VENTURE II CDO 2002,             )
18  LIMITED; VENTURE III CDO LIMITED;         )
    VENTURE IV CDO LIMITED; VENTURE           )
19  V CDO LIMITED; VENTURE VI CDO             )
    LIMITED; VENTURE VII CDO LIMITED;         )
20  VENTURE VIII CDO LIMITED; VENTURE         )
    IX CDO LIMITED; VISTA LEVERAGED           )
21  INCOME FUND; VEER CASH FLOW CLO,          )
    LIMITED; DUANE STREET CLO 1, LTD.;        )
22  DUANE STREET CLO II, LTD.; DUANE          )
    STREET CLO III, LTD.; DUANE STREET        )
23  CLO IV, LTD.; DUANE STREET CLO V,         )
    LTD.; JAY STREET MARKET VALUE             )
24  CLO I, LTD.; RIVA RIDGE MASTER            )

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-3-

741299

1    FUND, LTD.; MARINER LDC; and )
     GENESIS CLO 2007-1 LTD., )
2    )
          Plaintiffs, )
3    )
     vs. )
4    )
     BANK OF AMERICA, N.A.; MERRILL )
5    LYNCH CAPITAL CORPORATION; )
     JPMORGAN CHASE BANK, N.A.; )
6    BARCLAYS BANK PLC; DEUTSCHE )
     BANK TRUST COMPANY AMERICAS; )
7    THE ROYAL BANK OF SCOTLAND PLC; )
     SUMITOMO MITSUI BANKING )
8    CORPORATION; BANK OF SCOTLAND; )
     HSH NORDBANK AG; MB FINANCIAL )
9    BANK, N.A.; and CAMULOS MASTER )
     FUND, L.P., )
10   )
          Defendants. )
11   )

12

13

14

15

16

17

18

19

20

21

22

23

24

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-4-

741299

1    This action is brought by the Plaintiffs, each of which are lenders under a June 2007 Credit

2    Agreement (the "Credit Agreement"), by and among, *inter alia*, Fontainebleau Las Vegas, LLC and

3    Fontainebleau Las Vegas II, LLC (the "Borrowers"), the lenders referred to therein, and Bank of

4    America N.A, in many capacities (in all capacities, "BofA") intended to provide funds for the

5    construction of the Fontainebleau Resort and Casino (the "Project") in Las Vegas, Nevada, against

6    Bank of America, N.A., Merrill Lynch Capital Corporation, J.P. Morgan Chase Bank, N.A.,

7    Barclays Bank PLC, Deutsche Bank Trust Company Americas, The Royal Bank of Scotland PLC,

8    Sumitomo Mitsui Banking Corporation, Bank of Scotland, HSH Nordbank AG, MB Financial Bank,

9    N.A., and Camulos Master Fund, L.P. ("Defendants"), each of which are also lenders under the

10    Credit Agreement, for Defendants' failure and refusal to fund their contractual loan commitments

11    under the Credit Agreement, and for BofA's breach of its obligations under a related Disbursement

12    Agreement.  Plaintiffs allege for their complaint as follows:

### JURISDICTION AND VENUE

13

14    1.    This Court has jurisdiction over the subject matter of this action pursuant to

15    12 U.S.C. § 632 because defendants BofA, JPMorgan Chase Bank, N.A. and MB Financial Bank,

16    N.A. are national banking associations organized under the laws of the United States and the action

17    arises out of transactions involving international or foreign banking or other international or foreign

18    financial operations, within the meaning of 12 U.S.C. § 632.

19    2.    Venue in the United States District Court for the District of Nevada is proper because

20    the Project is located in this District and many of the acts and transactions at issue occurred in this

21    District.

### INTRODUCTORY ALLEGATIONS

22

23    3.    In March 2007, Plaintiffs were approached by a syndicate of investment bankers,

24    including affiliates of the Defendants, to participate in a $1.85 billion bank financing for the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    development and construction of the Project. The total project costs were to be funded primarily

2    from cash provided by the developers of the Project, the proceeds of the $1.85 billion bank

3    financing, and the proceeds of a $675 million 2nd Mortgage Note offering.

4         4.     In June 2007, the Credit Agreement was entered into among numerous lenders,

5    including Plaintiffs and Defendants, and the Borrowers. The Credit Agreement included

6    commitments for three kinds of loans: (a) a $700 million initial term loan facility (the "Term Loan

7    Facility"); (b) a $350 million delay draw term facility (the "Delay Draw Facility"); and (c) an

8    $800 million revolving loan facility (the "Revolver Facility"). The Term Loan Facility was funded

9    upon the closing of the Credit Agreement in June 2007. The Delay Draw Facility and Revolver

10    Facility were to be used to fund future construction costs of the Project.

11         5.     Plaintiffs are each lenders under the Term Loan Facility and under the Delay Draw

12    Facility. Defendants are each lenders under the Revolver Facility. The lenders' funding

13    commitments under each of the facilities were integral to the construction and development of the

14    Project, and to Plaintiffs' decision to make their loan commitments. Each of the lenders agreed that

15    their loan commitments were several and not joint, and that the failure of any lender to fund its loan

16    commitments did not relieve any other lender of its obligation to fund its loan commitments, nor

17    was any lender required to fund another defaulting lender's loan commitments. Moreover, each of

18    the lenders agreed that its obligation to fund loans was not conditioned on the absence of any Events

19    of Default (as that term is defined in the Credit Agreement) at the time of the borrowing request.

20    Rather, the Delay Draw Facility lenders and the Revolver Facility lenders could refuse to fund their

21    obligations only if their commitments were validly terminated in accordance with the specific terms

22    of the Credit Agreement.

23         6.     Obligations outstanding under the Term Loan Facility, the Delay Draw Facility and

24    the Revolver Facility are equally and ratably collateralized by mortgages on the real property

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

1    comprising the Project and by security interests on all personal property of the Borrowers. The

2    personal property security interests as well as statutory and/or common law rights of setoff also

3    extend to deposit accounts, including the Bank Proceeds Account (defined below) and the Bank

4    Funding Account established pursuant to the terms of the Master Disbursement Agreement (the

5    "Disbursement Agreement").

6         7.    Under the Credit Agreement and other Loan Documents, BofA acted in several

7    capacities, including as a Revolver Facility lender, as Issuing Lender, and as Swing Line Lender. In

8    addition, BofA served as Administrative Agent to all of the Lenders under the Credit Agreement and

9    as Disbursement Agent to all of the Lenders under the Disbursement Agreement. As a consequence

10   of those latter roles, BofA had access to information unavailable to other lenders.

11        8.    On March 2, 2009, the Borrowers issued a notice of borrowing to borrow the entire

12   amount available under the Delay Draw Facility and to borrow the remaining amount available

13   under the Revolver Facility (the "March 2 Notice"). The next day, the Borrowers issued another

14   notice of borrowing to correct a scrivener's error made in calculating the amount sought under the

15   Revolver Facility (the "March 3 Notice"). Both notices caused the Delay Draw Facility to be fully

16   drawn. At the time of these notices of borrowing, the Plaintiffs were unaware of the existence of

17   any Event of Default and no lender's obligation to fund loans under the Credit Agreement had been

18   terminated.

19        9.    BofA submitted the March 2 Notice and the March 3 Notice to the lenders, but

20   determined that the notices did not comply with the terms of the Credit Agreement and advised the

21   lenders that an ad hoc steering committee formed by BofA supported the position that the March 3

22   Notice did not comply with the terms of the Credit Agreement. BofA's communications to the

23   Plaintiffs regarding the invalidity of the March 2 Notice and the March 3 Notice did not provide any

24   information in BofA's possession that would have put Plaintiffs on notice of the existence of an

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-3-

741299

1    Event of Default under the Credit Agreement.

2         10.    BofA also informed the Borrowers that it would not be processing the March 2

3    Notice because it did not comply with the terms of the Credit Agreement.  In its correspondence to

4    the Borrowers, BofA took the position that the March 2 Notice and the March 3 Notice did not

5    comply with the Credit Agreement because they contained simultaneous requests for borrowing

6    under both the Delay Draw Facility and the Revolver Facility.  A simultaneous request for loans

7    under the two facilities, however, is not prohibited under and is consistent with the Credit

8    Agreement.

9         11.    The pretext for BofA's position is a provision in the Credit Agreement, Section

10   2.1(c)(iii), which BofA interpreted to mean that the outstanding balance of the Revolver Facility

11   loans under the Credit Agreement are limited to $150 million unless the Delay Draw Facility is fully

12   funded.  This position, however, is contrary to the plain language of the Credit Agreement which

13   provides that the outstanding balance of the Revolver Facility loans and Swing Line loans can

14   exceed $150 million once the "Total Delay Draw Commitments have been fully *drawn*."  (emphasis

15   added)

16        12.    BofA's refusal to honor the March 2 Notice and the March 3 Notice can only be valid

17   if "fully drawn" actually means that the Delay Draw Facility must be "fully funded" in advance of

18   issuing a notice of borrowing for the Revolver Facility loan, and that until the Delay Draw Facility

19   is fully funded, no Revolver Facility lender is required to meet its obligation to make loans to the

20   Borrowers.  Such position is not only inconsistent with the language of the Credit Agreement quoted

21   above, it is also inconsistent with other provisions of the Credit Agreement that specifically impose

22   a legal obligation on each lender to fund loans, even if other lenders fail to meet their obligations to

23   do so.  Under BofA's flawed interpretation, the Revolver Facility lenders could refuse to fund if the

24   Borrowers requested a full draw down of the Delay Draw Facility, but one of the Delay Draw

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-4-

741299

1  Facility lenders failed to fund. This is not what the lenders agreed to under the Credit Agreement

2  since the Credit Agreement specifies that no lender's obligation to fund loans is contingent on

3  another lender fulfilling its loan commitments.

4       13.    Immediately after the Revolver Facility lenders failed and refused to fund loans in

5  response to the March 2 Notice and the March 3 Notice, BofA sought to schedule a meeting with

6  representatives of the Project and other lenders, including Defendants, to discuss "construction

7  concerns." On information and belief, BofA's concerns were based upon information it obtained

8  regarding the Project and the Borrowers, including the Borrowers' ability to complete the project

9  using available funds, the Borrowers' ability to repay outstanding amounts under the Revolver

10 Facility and any other amounts to be advanced by the Revolver Facility lenders to Borrowers, and/or

11 that one or more Events of Default might have occurred before the March 3 Notice. BofA thereafter

12 undertook to avoid its obligations under the Credit Agreement, and preferred the interests of the

13 Revolver Facility lenders, including itself, over the Delay Draw Facility lenders by failing to provide

14 information in its possession to Plaintiffs concerning the status and financial condition of the

15 Project, the potential existence of Events of Default under the Credit Agreement, and BofA's

16 position regarding funding draws on the Revolver Facility.

17      14.    On March 9, 2009, the Borrowers, noting that they continued to believe that the

18 March 2 Notice and the March 3 Notice were valid and that BofA "may be acting in its own self-

19 interest by failing to process the notices," issued a revised borrowing notice directed solely to the

20 Delay Draw Facility lenders. BofA processed this notice and sent it to all Delay Draw Facility

21 lenders. On information and belief, BofA failed to provide Plaintiffs information in BofA's

22 possession regarding the Borrowers, the Project, the potential existence of Events of Defaults under

23 the Credit Agreement, and BofA's position regarding future fundings under the Revolver Facility.

24 Unaware of the existence of Events of Default, if any, on or about March 10, 2009 and thereafter,

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-5-

741299

1    Plaintiffs complied with their Delay Draw Facility commitments and honored their obligations to

2    fund the Delay Draw Facility.  Pursuant to the terms of the Credit Agreement, a portion of these

3    funds was immediately used to repay the outstanding balance under the Revolver Facility, including

4    loans made by BofA, thus benefiting the Defendants, to the detriment of the Plaintiffs.

5        15.    The balance of the funds received under the Delay Draw Facility was placed into the

6    Bank Proceeds Account (as defined below).  These funds could only be transferred out of the Bank

7    Proceeds Account to the Bank Funding Account and then to pay construction costs pursuant to an

8    Advance Request that was approved by BofA as Disbursement Agent in accordance with the

9    provisions contained in the Disbursement Agreement.  BofA could only approve the Advance

10   Request if various representations and warranties were made, including, but not limited to, that, as

11   of the Advance Date, there was no Default or Event of Default under any of the Financing

12   Agreements, the In Balance Test was satisfied, that there had been no development or event since

13   the Closing Date that could reasonably be expected to have a Material Adverse Effect on the Project,

14   and the Borrowers and their subsidiaries were solvent on a consolidated basis.

15       16.    The Delay Draw Facility lenders are intended third party beneficiaries of the

16   Disbursement Agreement. The Disbursement Agreement expressly provides that BofA holds for the

17   benefit of the Delay Draw Facility lenders the security interests granted by and the restrictions on

18   disbursal of funds from the Bank Proceeds Account and the Bank Funding Account contained in the

19   transaction documents, including but not limited to Section 2.3 of the Disbursement Agreement.

20   Additionally, Section 9.10 of the Disbursement Agreement expressly provides that BofA is

21   responsible and liable to the Delay Draw Facility lenders as a consequence of its performance under

22   the Disbursement Agreement for acts of bad faith, fraud, gross negligence or willful misconduct.

23       17.    As of March 25, 2009, the Advance Date requested by the Borrowers, either BofA

24   was aware of defaults or misrepresentations by the Borrowers, or the Revolver Facility lenders'

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-6-

741299

1  failure to fund the Revolver Facility pursuant to the March 2 Notice or the March 3 Notice was a

2  default under the Financing Agreements. Either way, BofA should not have approved the Advance

3  Request. Instead, BofA approved the request and caused approximately $133 million of the Delay

4  Draw Facility funds to be transferred out of the Bank Proceeds Account. Once again, by approving

5  this request for funds, and in violation of its obligations as Disbursement Agent, BofA favored its

6  position to the detriment of the Delay Draw Facility lenders.

7          18.    Shortly after Plaintiffs' funding of the Delay Draw Facility and the release of

8  approximately $133 million of Delay Draw Facility funds from the Bank Proceeds Account, on

9  April 20, 2009, Defendants purported to terminate their Revolver Facility loan commitments based

10  on one or more unspecified Events of Default. While Events of Default may have existed before

11  March 3, 2009, Plaintiffs are unaware of any Event of Default which first occurred between March

12  3, 2009 and April 20, 2009 under the Credit Agreement; however, even if such Events of Default

13  existed on April 20, 2009, Defendants could not retroactively terminate their existing obligations to

14  fund in response to the March 2 Notice and the March 3 Notice, when there were no claimed Events

15  of Default and the Revolver Facility had not been terminated. Either there existed an Event of

16  Default on March 3, which, had it been known by Plaintiffs, would have allowed all lenders to

17  terminate their unfunded commitments, or there was no such event, leaving all lenders equally

18  obligated to fund pursuant to the March 2 Notice and the March 3 Notice.

19          19.    Plainly, the world's economic circumstances have negatively impacted the Project.

20  These economic circumstances, however, do not justify Defendants' refusal to fund their loan

21  commitments and their wrongful termination of the Credit Agreement at this critical juncture. As a

22  consequence of Defendants' wrongful refusal to fund and their termination of the Revolver Facility

23  commitments, the Project has been derailed. More importantly, for purposes of this Action,

24  Defendants' failure to perform their contractual obligations reduced the amount and value of the

-7-

1    collateral securing Plaintiffs' loans contrary to Plaintiffs' bargained for rights and benefits under the

2    Credit Agreement and Disbursement Agreement.

3                                **PARTIES**

4      **Plaintiffs**

5        20.     Plaintiff Avenue CLO Fund, Ltd. is a company with limited liability incorporated

6    under the laws of the Cayman Islands.

7        21.     Plaintiff Avenue CLO II, Ltd. is a company incorporated with limited liability under

8    the laws of the Cayman Islands.

9        22.     Plaintiff Avenue CLO III, Ltd. is a company incorporated with limited liability under

10    the laws of the Cayman Islands.

11        23.     Plaintiff Avenue CLO IV, Ltd. is a company incorporated with limited liability under

12    the laws of the Cayman Islands.

13        24.     Plaintiff Avenue CLO V, Ltd. is a company incorporated with limited liability under

14    the laws of the Cayman Islands.

15        25.     Plaintiff Avenue CLO VI, Ltd. is a company incorporated with limited liability under

16    the laws of the Cayman Islands.

17        26.     Plaintiff Babson CLO Ltd. 2004-I is a company incorporated with limited liability

18    under the laws of the Cayman Islands.

19        27.     Plaintiff Babson CLO Ltd. 2004-II is a company incorporated with limited liability

20    under the laws of the Cayman Islands.

21        28.     Plaintiff Babson CLO Ltd. 2005-I is a company incorporated with limited liability

22    under the laws of the Cayman Islands.

23        29.     Plaintiff Babson CLO Ltd. 2005-II is a company incorporated with limited liability

24    under the laws of the Cayman Islands.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

30.    Plaintiff Babson CLO Ltd. 2005-III is a company incorporated with limited liability under the laws of the Cayman Islands.

31.    Plaintiff Babson CLO Ltd. 2006-I is a company incorporated with limited liability under the laws of the Cayman Islands.

32.    Plaintiff Babson CLO Ltd. 2006-II is a company incorporated with limited liability under the laws of the Cayman Islands.

33.    Plaintiff Babson CLO Ltd. 2007-I is a company incorporated with limited liability under the laws of the Cayman Islands.

34.    Plaintiff Artus Loan Fund 2007-I Ltd. is a company incorporated with limited liability under the laws of the Cayman Islands.

35.    Plaintiff Babson Loan Opportunity CLO, Ltd. is a company incorporated with limited liability under the laws of the Cayman Islands.

36.    Plaintiff JFIN CLO 2007 Ltd. is a company incorporated with limited liability under the laws of the Cayman Islands.

37.    Plaintiff Sapphire Valley CDO I, Ltd. is a company incorporated with limited liability under the laws of the Cayman Islands.

38.    Plaintiff Jefferies Finance CP Funding LLC is a limited liability company formed under the laws of Delaware with its principal place of business in New York, NY;

39.    Plaintiff Brigade Leveraged Capital Structures Fund, Ltd. is an exempted company incorporated with limited liability under the laws of the Cayman Islands.

40.    Plaintiff Battalion CLO 2007-1 Ltd. is an exempted company incorporated with limited liability under the laws of the Cayman Islands.

41.    Plaintiff Canyon Capital Advisors LLC is a limited liability company formed under the laws of the State of Delaware.  Canyon Capital Advisors LLC is the investment advisor of funds

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-9-

1    that are the holders of Term Loans.

2        42.     Plaintiff Caspian Corporate Loan Fund, LLC is a limited liability company formed

3    under the laws of Delaware.

4        43.     Plaintiff Caspian Capital Partners, L.P. is a limited partnership formed under the laws

5    of Delaware.

6        44.     Plaintiff Caspian Select Credit Master Fund, Ltd. is a limited liability company

7    formed under the laws of the Cayman Islands.

8        45.     Plaintiff Mariner Opportunities Fund, LP is a limited partnership formed under the

9    laws of Delaware.

10        46.     Plaintiff Sands Point Funding Ltd. is a company with limited liability incorporated

11    under the laws of the Cayman Islands.

12        47.     Plaintiff Copper River CLO Ltd. is a company with limited liability incorporated

13    under the laws of the Cayman Islands.

14        48.     Plaintiff Kennecott Funding Ltd. is a company with limited liability incorporated

15    under the laws of the Cayman Islands.

16        49.     Plaintiff NZC Opportunities (Funding) II Limited is a company with limited liability

17    incorporated under the laws of the Cayman Islands.

18        50.     Plaintiff Green Lane CLO Ltd. is a company with limited liability incorporated under

19    the laws of the Cayman Islands.

20        51.     Plaintiff 1888 Fund, Ltd. is a company with limited liability incorporated under the

21    laws of the Cayman Islands.

22        52.     Plaintiff Orpheus Funding LLC is a Delaware limited liability company.

23        53.     Plaintiff Orpheus Holdings LLC is a Delaware limited liability company.

24        54.     Plaintiff LFC2 Loan Funding LLC is a Delaware limited liability company.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

55.    Plaintiff Halcyon Loan Investors CLO I Ltd. is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

56.    Plaintiff Halcyon Loan Investors CLO II Ltd. is an exempted company incorporated with limited liability under the laws of the Cayman Islands.

57.    Plaintiff Halcyon Structured Asset Management Long Secured/Short Unsecured CLO 2006-1 Ltd. is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

58.    Plaintiff Halcyon Structured Asset Management European CLO 2008-II B.V. is a company with limited liability incorporated under the laws of The Netherlands.

59.    Plaintiff Halcyon Structured Asset Management CLO I Ltd. is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

60.    Plaintiff Halcyon Structured Asset Management Long Secured/Short Unsecured 2007-1 Ltd. is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

61.    Plaintiff Halcyon Structured Asset Management Long Secured/Short Unsecured 2007-2 Ltd. is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

62.    Plaintiff Halcyon Structured Asset Management Long Secured/Short Unsecured 2007-3 Ltd. is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

63.    Plaintiff Aberdeen Loan Funding, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

64.    Plaintiff Armstrong Loan Funding, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-11-

65. Plaintiff Brentwood CLO, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

66. Plaintiff Eastland CLO, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

67. Plaintiff Emerald Orchard Limited is a company with limited liability incorporated under the laws of the Cayman Islands.

68. Plaintiff Gleneagles CLO, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

69. Plaintiff Grayson CLO, Ltd. is a company incorporated under the laws of the Cayman Islands.

70. Plaintiff Greenbriar CLO, Ltd. is a company incorporated under the laws of the Cayman Islands.

71. Plaintiff Highland Credit Opportunities CDO, Ltd. is a company incorporated under the laws of the Cayman Islands.

72. Plaintiff Highland Loan Funding V, Ltd. is a company incorporated under the laws of the Cayman Islands.

73. Plaintiff Highland Offshore Partners, L.P. is limited partnership formed under the laws of Bermuda.

74. Plaintiff Jasper CLO, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

75. Plaintiff Liberty CLO, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

76. Plaintiff Loan Funding IV LLC is a is a Delaware limited liability company.

77. Plaintiff Loan Funding VII LLC is a Delaware limited liability company.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-12-

1    78.    Plaintiff Loan Star State Trust is a trust formed under the laws of the Cayman

2  Islands.

3    79.    Plaintiff Longhorn Credit Funding, LLC is a limited liability company formed under

4  the laws of the State of Delaware.

5    80.    Plaintiff Red River CLO, Ltd. is a company with limited liability incorporated under

6  the laws of the Cayman Islands.

7    81.    Plaintiff Rockwall CDO, Ltd. is a company with limited liability incorporated under

8  the laws of the Cayman Islands.

9    82.    Plaintiff Rockwall CDO II, Ltd. is a company with limited liability incorporated

10  under the laws of the Cayman Islands.

11    83.    Plaintiff Southfork CLO, Ltd. is a company with limited liability incorporated under

12  the laws of the Cayman Islands.

13    84.    Plaintiff Stratford CLO, Ltd. is a company with limited liability incorporated under

14  the laws of the Cayman Islands.

15    85.    Plaintiff Westchester CLO, Ltd. is a company with limited liability incorporated

16  under the laws of the Cayman Islands.

17    86.    Plaintiff ING Prime Rate Trust is a business trust formed under the laws of

18  Massachusetts.

19    87.    Plaintiff ING Senior Income Fund is a statutory trust formed under the laws of

20  Delaware.

21    88.    Plaintiff ING International (II) - Senior Bank Loans Euro is a SICAV (Société

22  d'Investissement à Capital Variable) formed under the laws of Luxembourg.

23    89.    Plaintiff ING International (II) - Senior Bank Loans USD is a SICAV (Société

24  d'Investissement à Capital Variable) formed under the laws of Luxembourg.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

90.     Plaintiff ING Investment Management CLO I, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

91.     Plaintiff ING Investment Management CLO II, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

92.     Plaintiff ING Investment Management CLO III, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

93.     Plaintiff ING Investment Management CLO IV, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

94.     Plaintiff ING Investment Management CLO V, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

95.     Plaintiff Encore Fund LP is a limited partnership formed under the laws of the Cayman Islands.

96.     Plaintiff Nuveen Floating Rate Income Fund is organized as a Massachusetts business trust.

97.     Plaintiff Fortissimo Fund is a limited partnership formed under the laws of the Cayman Islands.

98.     Plaintiff Nuveen Floating Rate Income Opportunity Fund is organized as a Massachusetts business trust.

99.     Plaintiff Nuveen Senior Income Fund is organized as a Massachusetts business trust.

100.     Plaintiff Symphony Credit Opportunity Fund, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

101.     Plaintiff Symphony CLO I, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

102.     Plaintiff Symphony CLO II, Ltd. is a company with limited liability incorporated

741299

1  under the laws of the Cayman Islands.

2      103.    Plaintiff Symphony CLO III, Ltd. is a company with limited liability incorporated

3  under the laws of the Cayman Islands.

4      104.    Plaintiff Symphony CLO IV, Ltd. is a company with limited liability incorporated

5  under the laws of the Cayman Islands.

6      105.    Plaintiff Symphony CLO V, Ltd. is a company with limited liability incorporated

7  under the laws of the Cayman Islands.

8      106.    Plaintiff Carlyle High Yield Partners 2008-1, Ltd. is an exempted company with

9  limited liability incorporated under the laws of the Cayman Islands.

10      107.    Plaintiff Carlyle High Yield Partners V, Ltd. is an exempted company with limited

11  liability incorporated under the laws of the Cayman Islands.

12      108.    Plaintiff Carlyle High Yield Partners VI, Ltd. is an exempted company with limited

13  liability incorporated under the laws of the Cayman Islands.

14      109.    Plaintiff Carlyle High Yield Partners VII, Ltd. is an exempted company with limited

15  liability incorporated under the laws of the Cayman Islands.

16      110.    Plaintiff Carlyle High Yield Partners VIII, Ltd. is an exempted company with limited

17  liability incorporated under the laws of the Cayman Islands.

18      111.    Plaintiff Carlyle High Yield Partners IX, Ltd. is an exempted company with limited

19  liability incorporated under the laws of the Cayman Islands.

20      112.    Plaintiff Carlyle Loan Investment, Ltd. is an exempted company with limited liability

21  incorporated under the laws of the Cayman Islands.

22      113.    Plaintiff Centurion CDO VI, Ltd. is a company with limited liability incorporated

23  under the laws of the Cayman Islands.

24

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

1       114.    Plaintiff Centurion CDO VII, Ltd. is a company with limited liability incorporated

2  under the laws of the Cayman Islands.

3       115.    Plaintiff Centurion CDO 8, Limited is a company with limited liability incorporated

4  under the laws of the Cayman Islands.

5       116.    Plaintiff Centurion CDO 9, Limited is a company with limited liability incorporated

6  under the laws of the Cayman Islands.

7       117.    Plaintiff Cent CDO 10 Limited is a company with limited liability incorporated under

8  the laws of the Cayman Islands.

9       118.    Plaintiff Cent CDO XI Limited is a company with limited liability incorporated under

10  the laws of the Cayman Islands.

11       119.    Plaintiff Cent CDO 12 Limited is a company with limited liability incorporated under

12  the laws of the Cayman Islands.

13       120.    Plaintiff Cent CDO 14 Limited is a company with limited liability incorporated under

14  the laws of the Cayman Islands.

15       121.    Plaintiff Cent CDO 15 Limited is a company with limited liability incorporated under

16  the laws of the Cayman Islands.

17       122.    Plaintiff Venture II CDO 2002, Limited is a company with limited liability

18  incorporated under the laws of the Cayman Islands.

19       123.    Plaintiff Venture III CDO is a company with limited liability incorporated under the

20  laws of the Cayman Islands.

21       124.    Plaintiff Venture IV CDO Limited is a company with limited liability incorporated

22  under the laws of the Cayman Islands.

23       125.    Plaintiff Venture V CDO Limited is a company with limited liability incorporated

24  under the laws of the Cayman Islands.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-16-

741299

1    126.    Plaintiff Venture VI CDO Limited is a company with limited liability incorporated

2    under the laws of the Cayman Islands.

3    127.    Plaintiff Venture VII CDO Limited is a company with limited liability incorporated

4    under the laws of the Cayman Islands.

5    128.    Plaintiff Venture VIII CDO Limited is a company with limited liability incorporated

6    under the laws of the Cayman Islands.

7    129.    Plaintiff Venture IX CDO Limited is a company with limited liability incorporated

8    under the laws of the Cayman Islands.

9    130.    Plaintiff Vista Leveraged Income Fund is a company with limited liability

10    incorporated under the laws of the Cayman Islands.

11    131.    Plaintiff Veer Cash Flow, CLO, Limited is a company with limited liability

12    incorporated under the laws of the Cayman Islands.

13    132.    Plaintiff Duane Street CLO 1, Ltd. is a company with limited liability incorporated

14    under the laws of the Cayman Islands.

15    133.    Plaintiff Duane Street CLO II, Ltd. is a company with limited liability incorporated

16    under the laws of the Cayman Islands.

17    134.    Plaintiff Duane Street CLO III, Ltd. is a company with limited liability incorporated

18    under the laws of the Cayman Islands.

19    135.    Plaintiff Duane Street CLO IV, Ltd. is a company with limited liability incorporated

20    under the laws of the Cayman Islands.

21    136.    Plaintiff Duane Street CLO V, Ltd. is a company with limited liability incorporated

22    under the laws of the Cayman Islands.

23    137.    Plaintiff Jay Street Market Value CLO I, Ltd. is a company with limited liability

24    incorporated under the laws of the Cayman Islands.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-17-

138.    Plaintiff Riva Ridge Master Fund, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

139.    Plaintiff Mariner LDC is a Cayman Islands limited duration company.

140.    Plaintiff Genesis CLO 2007-1 Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

**Defendants**

141.    Defendant BofA is a nationally chartered bank with its main office in Charlotte, North Carolina.  Under the Credit Agreement and other Loan Documents, BofA acted in several capacities, including as a Revolver Facility lender, as Issuing Lender, and as Swing Line Lender.  In addition, BofA served as Administrative Agent to all of the Lenders under the Credit Agreement and as Disbursement Agent to all of the Lenders under the Disbursement Agreement.  BofA agreed to fund $100 million under the Revolving Loan.

142.    Defendant Merrill Lynch Capital Corporation is a Delaware corporation with a principal place of business in New York.  Merrill Lynch Capital Corporation, which is now indirectly owned by BofA, agreed to fund $100 million under the Revolver facility.

143.    Defendant J.P. Morgan Chase Bank, N.A. is a nationally chartered bank with its headquarters in New York, New York.  J.P. Morgan Chase Bank, N.A. agreed to fund $90 million under the Revolver facility.

144.    Defendant Barclays Bank PLC is a public limited company in the United Kingdom with its principal place of business in London, England.  Barclays Bank PLC agreed to fund $100 million under the Revolver facility.

145.    Defendant Deutsche Bank Trust Company Americas is a New York State-chartered bank with its principal office in New York, New York.  Deutsche Bank Trust Company Americas agreed to fund $80 million under the Revolver facility.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-18-

741299

1    146.    Defendant The Royal Bank of Scotland PLC is a banking association organized

2    under the laws of the United Kingdom with a branch in New York, New York.  The Royal Bank of

3    Scotland PLC agreed to fund $90 million under the Revolver facility.

4    147.    Defendant Sumitomo Mitsui Banking Corporation is a Japanese corporation with

5    offices in New York, New York.  Sumitomo Mitsui Banking Corporation agreed to fund $90 million

6    under the Revolver facility.

7    148.    Defendant Bank of Scotland is chartered under the laws of Scotland, with its

8    principal place of business in Edinburgh, Scotland.  Bank of Scotland agreed to fund $72.5 million

9    under the Revolver facility.

10    149.    Defendant HSH Nordbank AG is a German banking corporation with a branch in

11    New York, New York.  HSH Nordbank AG agreed to fund $40 million under the Revolver facility.

12    150.    Defendant MB Financial Bank, N.A. is a nationally chartered bank with its main

13    office in Chicago, Illinois.  MB Financial Bank, N.A. agreed to fund $7.5 million under the

14    Revolver facility.

15    151.    Defendant Camulos Master Fund, L.P. is a Delaware corporation with its principal

16    place of business in Stamford, Connecticut.  Camulos Master Fund LP agreed to fund $20 million

17    under the Revolver Facility.

18    **THE FONTAINEBLEAU PROJECT**

19    152.    The Project is designed to be a destination casino-resort on the north end of the Las

20    Vegas Strip, situated on approximately 24.4 acres.  The Project consists of a 63-story glass

21    skyscraper featuring over 3,800 guest rooms, suites and condominium units; a 100-foot high three-

22    level podium complex housing casino/gaming areas, restaurants and bars, a spa and salon, a live

23    entertainment theater and rooftop pools; a parking garage with space for more than 6,000 vehicles;

24    and a 353,000 square-foot convention center.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-19-

741299

1      153.    The Project is also designed to feature retail space (the "Retail Space") of

2  approximately 286,500 square-feet, including retail shops, restaurants, and a nightclub.  The Retail

3  Space is being developed by indirect subsidiaries of the Borrowers' parent company ("Fontainebleau

4  Retail") and is funded by separate loans (the "Retail Financing").

5      154.    The Borrowers broke ground on the Project in January 2007.  The Project was

6  originally projected to be complete near year end 2009.

7                          **THE CREDIT AGREEMENT**

8      155.    The Credit Agreement provided for the Term Loan Facility of $700 million, the

9  Delay Draw Facility of $350 million, and the Revolver Facility of $800 million, all having a six-

10  year maturity.  Obligations outstanding under the Term Loan Facility, the Delay Draw Facility and

11  the Revolver Facility are equally and ratably collateralized by mortgages on the real property

12  comprising the Project and by security interests on all personal property of the Borrowers.  The

13  personal property security interests as well as statutory and/or common law rights of setoff also

14  extend to deposit accounts of the Borrowers, including the Bank Proceeds Account (the "Bank

15  Proceeds Account") established pursuant to the terms of the Disbursement Agreement.

16      156.    The Credit Agreement and other Loan Documents institute a two-step mechanism for

17  obtaining loans prior to the opening date of the Project.  First, the submission by the Borrowers to

18  the Administrative Agent of a notice of borrowing ("Notice of Borrowing") specifying the required

19  loans and designated borrowing date obligates the Lenders to transfer requested funds into the Bank

20  Proceeds Account.  Second, the Borrowers must submit an advance request pursuant to the

21  Disbursement Agreement (the "Advance Request"), typically monthly, to secure disbursements from

22  the Bank Proceeds Account that can then be used to pay for the costs of the Project.  The

23  Disbursement Agreement also establishes:  (a) the conditions to, and the relative sequencing of,

24  disbursements from the proceeds of various facilities and debt instruments, and (b) the obligations of

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-20-

741299

1  the various agents to make disbursements to the Borrowers of loan proceeds from the Bank Proceeds

2  Account.

### LENDER FUNDING OBLIGATIONS UNDER THE

### DELAY DRAW FACILITY AND THE REVOLVER FACILITY

5      157.    After the Borrowers submit to the Administrative Agent a Notice of Borrowing , the

6  Administrative Agent must promptly notify each lender of the Notice of Borrowing.  Once notified,

7  each lender must make its pro-rata share of the requested loans available to the Administrative

8  Agent prior to 10:00 AM on the designated borrowing date.  The Administrative Agent must then

9  make the funds available no later than 12:00 Noon on the borrowing date by remitting the loan

10  proceeds to the Bank Proceeds Account.

11      158.    Consistent with the staged disbursement process, Section 2.1(c)(iii) of the Credit

12  Agreement provides that the Revolver Facility lenders are not obligated to make loans exceeding

13  $150 million unless the Delay Draw Facility has been fully drawn.  Once the Delay Draw Facility is

14  fully drawn, as was done by the Borrowers' March 2 Notice and the March 3 Notice, the Revolver

15  Facility lenders are irrevocably obligated to fund their loan commitments, subject only to the

16  conditions contained in Section 5.2 of the Credit Agreement.  Section 2.1(c) of the Credit

17  Agreement provides that the "making of Revolving Loans which are Disbursement Agreement

18  Loans to the Bank Proceeds Account shall be subject **only** to the fulfillment of the applicable

19  conditions set forth in Section 5.2. . . ." (emphasis in Credit Agreement)

20      159.    The only relevant conditions to Defendants' contractual obligations to fund under the

21  Revolver Facility contained in Section 5.2 are:

22      (a) <u>Notice of Borrowing</u>. Borrowers shall have submitted a Notice of Borrowing
        specifying the amount and Type of the Loans requested, and the making thereof shall
23      be in compliance with the applicable provisions of Section 2 of this Agreement.

24                                          . . .

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

(c) <u>Drawdown Frequency</u>. Except for Loans made pursuant to Section 3 with respect to Reimbursement Obligations, Loans made pursuant to this Section shall be made no more frequently than once every calendar month unless the Administrative Agent otherwise consents in its sole discretion.

160.    Both of these conditions were met.  The only scenario under which a Revolver Facility lender can refuse to fund under the Revolver Facility is when the Revolver Facility has been terminated in compliance with the specific provisions of Section 8 of the Credit Agreement prior to receipt of a Notice of Borrowing.  Section 8 of the Credit Agreement provides that in the event of an Event of Default, which includes the material falsity of any representation or warranty under the Loan Documents, the Administrative Agent may, with certain required consents of the lenders, by notice to the Borrower declare the loan commitments terminated.  No such action was taken by the Revolver Facility lenders prior to the March 2 Notice or the March 3 Notice.

161.    Section 1.1 of the Credit Agreement defines a "Lender Default" as "the failure or refusal (which has not been retracted in writing) of a Lender to make available (i) its portion of any Loan required to be made by such Lender hereunder . . ."

162.    Section 2.23(g) of the Credit Agreement provides that the obligations to make loans are several and not joint, and the failure of any lender to make any loan does not relieve any other lender of its corresponding obligation to do so, nor is any other lender responsible for the failure of another lender to make its loan.

**DEFENDANTS' BREACHES UNDER THE CREDIT AGREEMENT**

163.    Defendants breached the Credit Agreement by refusing to fund their respective shares of the loan commitments under the Revolver Facility, and thereafter purportedly terminating altogether their loan commitments under the Credit Agreement.

-22-

741299

**Refusal to Honor the March 2009 Notices of Borrowing**

164.    On March 2, 2009, the Borrowers submitted a Notice of Borrowing for $350 million under the Delay Draw Facility and $670 million under the Revolver Facility (the "March 2 Notice"). Under the Credit Agreement, the Plaintiffs were obligated to fund under the Delay Draw Facility, and the Defendants were obligated to fund under the Revolver Facility by March 3, 2009.

165.    On March 3, 2009, BofA, as the Administrative Agent, sent a letter (the "March 3 Agent Letter") to Borrowers stating that it would not process the March 2 Notice.  The Administrative Agent claimed that the March 2 Notice did not comply with the provisions of Section 2.1(c) of the Credit Agreement, which states that "unless the Total Delay Draw Commitments have been fully drawn, the aggregate outstanding principal amount of all Revolving Loans and Swing Line Loans shall not exceed $150,000,000."  The outstanding principal amount on the Revolver Facility and Swing Line loans on March 3, 2009 was less than $150,000,000.

166.    Also on March 3, 2009 BofA posted on Intralinks a message available to the lenders noting that BofA had determined that the notice of borrowing did not comply with the terms of the Credit Agreement.  While several lenders had already advanced their pro-rata share of the funds, the Administrative Agent on its own accord returned these funds.

167.    As of March 9, 2009, Plaintiffs had not been informed that any Event of Default existed under the Credit Agreement.  However, Plaintiffs are informed and believe that prior to March 3, 2009, BofA had obtained information concerning the Project that caused BofA to determine Events of Default may have existed and that it was in its best interests as a Revolver Facility lender not to comply with the notices of borrowing.  Rather, it was in BofA's interest as a Revolver Facility lender to see that Delay Draw Facility lenders complied with the Notice of Borrowing directed to such lenders, while preventing the funding of the Revolver Facility.  To accomplish this goal, BofA enlisted the support of the other Revolver Facility lenders, including

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-23-

741299

1   Defendants, for its position that the March 2 Notice and the March 3 Notice should not be honored

2   by sharing information with the Defendants concerning the financial condition and status of the

3   Project and the Borrowers, while withholding such information from the Delay Draw Facility

4   lenders.

5        168.    On March 3, 2009, the Borrowers replied to the Administrative Agent by letter

6   ("March 3 Letter") advising that the March 3 Agent Letter was in error and urging the

7   Administrative Agent to reconsider.  The March 3 Letter explained that the Credit Agreement does

8   not prevent the Borrowers from requesting the full amount of the Delay Draw Facility and Revolver

9   Facility pursuant to one Notice of Borrowing.  The Borrowers also submitted an amended Notice of

10  Borrowing ("March 3 Notice") to correct a calculation error specifying that the amount sought was

11  actually $656.52 million.

12       169.    On March 4, 2009, an officer with BofA's Special Assets group with responsibility

13  for the Project wrote to the Borrowers announcing that BofA had formed an ad hoc steering

14  committee (the "Steering Committee") with other unspecified lenders, and that this Steering

15  Committee had decided that the March 2 Notice did not conform to the requirements under the

16  Credit Agreement.

17       170.    On March 6, 2009, the Borrowers sent a letter to the Administrative Agent again

18  noting that the Administrative Agent had improperly failed and refused to process the Notice of

19  Borrowing based on a contrived construction of Section 2.1 of the Credit Agreement.  The letter also

20  noted that other lender parties to the Credit Agreement had informed the Borrowers that they

21  disagreed with the Administrative Agent's interpretation.

22       171.    In light of Defendants' trumped up refusal to fund due to the simultaneous draw

23  notices, and without withdrawing or waiving any rights under the first notice of borrowing, on

24  March 9, 2009 the Borrowers submitted another notice of borrowing requesting only the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-24-

1  $350 million remaining under the Delay Draw Facility ("March 9 Notice").  The Borrowers

2  expressly reserved their right to contest the Administrative Agent's decision to deny, and the

3  Revolver Facility lenders' refusal to provide, funding under the Revolver Facility in response to the

4  March 2 Notice and the March 3 Notice.  The Borrowers explained that the March 9 Notice was

5  being submitted only because of the ongoing need to pay for the costs of the Project.

6          172.    On or about March 10, 2009 and thereafter, pursuant to the March 9 Notice,

7  $336 million of the Delay Draw Facility was funded.  A portion of these funds were utilized to pay

8  down the outstanding balance of the Revolver Facility.

9          173.    None of the Defendants have funded their outstanding commitments under the

10  Revolver Facility.

11          174.    The Defendants' failure and refusal to fund the Revolver Facility in response to the

12  March 2 Notice and March 3 Notice is a Lender Default under the express terms of the Credit

13  Agreement.

14          **Improper Approval of the March 25, 2009 Advance Request**

15          175.    On March 4, 2009, in the same letter informing the Borrowers that a Steering

16  Committee had been formed, the Administrative Agent stated that it was "increasingly anxious" to

17  meet with the Borrowers to discuss the Project in light of "construction issues," the "current

18  economic crisis," and "other topics of interest."  No specific concern was mentioned.  The

19  Borrowers responded on March 16, 2009, stating that they would host a meeting, but that neither

20  holding such a meeting nor providing such information was a condition precedent to the lenders'

21  compliance with the March 2 Notice or the March 3 Notice.

22          176.    On March 16, 2009, BofA sent a letter to the Borrowers acknowledging a meeting

23  with the Borrowers was scheduled for March 20, 2009 and confirming receipt of an Advance

24  Request.  BofA noted that the requested Advance Date was March 25, 2009 and stated that

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

1  legitimate questions had been raised by the lenders concerning the Project. BofA also suggested that
2  they would require the Advance Request strictly conform with the terms of the Disbursement
3  Agreement.

4      177.    On March 20, 2009, a meeting was held at the Project site, attended by certain
5  Revolver Facility lenders and other lenders. The information exchanged and discussions which
6  occurred during this meeting preceded the Borrowers drafting an Interim Agreement dated as of
7  April 1, 2009, which provided in part that the lenders signing the agreement would not terminate the
8  Revolving Commitments or declare a Default of Event of Default.

9      178.    On March 25, 2009, the Borrowers finalized the documentation in support of their
10  March Advance Request. BofA authorized the release of $133 million from the Bank Proceeds
11  Account, notwithstanding the information that it and other Revolving Facility lenders had in their
12  possession regarding Defaults or Events of Default. As of March 25, 2009, BofA was aware that the
13  Advance Request should be denied because of existing defaults or misrepresentations under the
14  Financing Agreements; at a minimum, BofA was aware the Borrowers were alleging that the
15  Revolver Facility lenders were in default of their obligations under the Credit Agreement and had
16  reserved all of their rights in connection with that default. The Borrowers reiterated that position in
17  an April 21, 2009 letter to BofA. In its various capacities, including but not limited to as
18  Disbursement Agent, Bank Agent, and Administrative Agent, BofA had a duty to act in good faith
19  and to exercise commercially reasonable efforts and commercially prudent practices in approving
20  Advance Requests. Instead of fulfilling these duties, BofA acted in bad faith and favored its own
21  interests over that of the Delay Draw Facility lenders and disregarded evidence in its possession that
22  the March Advance Request should be denied.

23      **Improper Termination of the Revolving Loan Commitments**

24      179.    On April 13, 2009, the Borrowers notified the lenders (the "April 13 Notice")

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-26-

741299

1    pursuant to the Disbursement Agreement and other Loan Documents, that as of that date it did not

2    believe that the Project satisfied the test that remaining costs and available funds be in balance (the

3    "In Balance Test"). Under the Disbursement Agreement, for the In Balance Test to be met, the

4    remaining costs to complete the Project cannot exceed Borrowers' available resources. Failure to

5    satisfy the In Balance Test is not an Event of Default, and does not permit the Administrative Agent

6    or the Revolver Facility lenders to refuse to comply with a Notice of Borrowing.

7    180. On April 17, 2009, the Borrowers and certain lenders met in New York to discuss the

8    status of the Project. On April 20, 2009, the Steering Committee's counsel sent a letter to the

9    Borrowers' counsel on behalf of "a number of Steering Committee institutions," including lenders

10   under the Revolver Facility. The letter requested additional information, including an assessment of

11   the March In Balance Test.

12   181. Also on April 20, 2009, only hours after the request for additional information had

13   been sent, and prior to any response by Borrowers, the Administrative Agent sent the Borrowers a

14   letter (the "Termination Letter") stating that the lenders under the Revolver Facility had determined

15   that "one or more Events of Default have occurred and are continuing" and that the Revolver

16   Facility commitments were terminated effective immediately. The Termination Letter did not

17   specify the nature of the purported Events of Default.

18   182. On April 21, 2009, the Borrowers' counsel wrote a letter to the Administrative

19   Agent's counsel advising that there had been no Event of Default, that the Termination Letter was

20   ineffective, and that unless it was withdrawn immediately the Borrowers would pursue all available

21   remedies.

22   **Failure to Honor the April 21, 2009 Notice of Borrowing**

23   183. On April 21, 2009, the Borrowers submitted a Notice of Borrowing (the "April 21

24   Notice") to the Administrative Agent, drawing down $710 million under the Revolver Facility.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA